**FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff,**

**v.**

**PERRY BROTHERS, INC., Defendant and Counter–Plaintiff,**

**v.**

**NATIONSBANK OF TEXAS, N.A. f/k/a NCNB Texas National Bank, N.A., Counter–Defendant.**

**Civ. A. No. 9: 91 CV 181.**

United States District Court, E.D. Texas, Lufkin Division.

June 3, 1994.

1250

Mark T. Josephs, Timothy E. Taylor, Dallas, TX, John H. Minton, and James L. Hedrick, Tyler, TX, for plaintiff.

Mark S. Werbner, Lyndon F. Bittle, Dallas, TX, and Don W. Duran, Lufkin, TX, for defendant.

## SUPERSEDING AMENDED FINAL MEMORANDUM OPINION AND ORDER [1]

ROBERT M. PARKER, Chief Justice.

In accordance with the *Superseding Amended Final Judgment* entered contemporaneously with this *Superseding Amended Final Memorandum Opinion and Order,* the Court makes the following findings of fact and renders the following conclusions of law with respect to the above styled and numbered case tried before the 646 Court.

## I.

### Findings of Fact

1. Perry Brothers and the predecessor banks of NCNB (now NationsBank; hereinafter referenced as NCNB) had a longstanding special relationship of trust and confidence. This longstanding special relationship was assumed and ratified by NCNB after it purchased the assets of the failed First Republic Bank–Lufkin on July 29, 1988.

2. Officers of NCNB knew, as a result of communications with Perry Brothers, that the company had embarked on a multi-year restructuring of its operations, which involved "cash-flow" management rather than the emphasis upon operating profits, through the transition period, and that the company

1. This *Superseding Amended Final Memorandum Opinion and Order* supersedes *Memorandum Opinions and Orders* entered by the Court on December 17, 1993 and March 30, 1994. This *Superseding Amended Final Memorandum* *Opinion and Order* substitutes the now-applicable, controlling post-judgment rate for the last entered, then-applicable rate reflected in the Court's March 30, 1994 *Final Memorandum Opinion and Order.*

would be financially vulnerable until its transition was completed. NCNB approved of these plans, and assured Perry Brothers that the bank would support the company in its restructuring through this difficult transition period.

3. An oral contract was made by and between NCNB and Perry Brothers in 1988, according to which: (a) **Perry Brothers** agreed that it would pay NCNB $2,500,000 from the proceeds of a 7-year loan it would receive from the T.L.L. Temple Foundation (Temple Foundation), would use its renewed line of credit with NCNB for seasonal inventory needs, and would continue to be a depository customer of NCNB; and (b) **NCNB** promised that it would renew at maturity the company's line of credit on essentially the same terms as set forth in the 1988 loan documents—unless the company experienced material, unanticipated, adverse changes · in its financial condition—and that the bank would consider renewal each year in the spirit of fairness and good faith that had previously characterized the longstanding relationship between Perry Brothers and NCNB's predecessor bank.

4. NCNB made fraudulent misrepresentations to Perry Brothers regarding the bank's willingness to renew the line of credit on essentially the same terms as in the past—because at the time it made such representations to Perry Brothers, NCNB in fact had no intention of carrying out these promises. Perry Brothers' reliance on these NCNB misrepresentations was reasonable and justifiable under the circumstances.

5. In April, 1989, NCNB actively discouraged Perry Brothers from pursuing alternative financing even though it knew Perry Brothers' line of credit was essential for the company during its transition period and even though in March, 1989, NCNB had in fact secretly changed its credit strategy regarding Perry Brothers to "decrease." The discouragement by NCNB communicated false and misleading information to Perry Brothers regarding NCNB's intentions, on which Perry Brothers reasonably and justifiably relied to its detriment. By the time

Perry Brothers learned, in September 1989, that NCNB would *not* renew the line of credit in good faith on reasonable terms, the company had lost any opportunity to obtain alternative financing.

6. Prior to July 31, 1989, NCNB unambiguously and affirmatively represented to Perry Brothers that there would be "no problem" with the renewal of the company's line of credit. NCNB intended and knew this representation would be relied upon by the company, yet the representation was false and was made by NCNB with knowledge of its falsity, or at least with deliberate indifference to its truth or falsity. NCNB's officers failed to pursue authorization of the renewal prior to maturity in July 1989, despite their knowledge of Perry Brothers' vulnerability and dependence upon the bank's good faith renewal obligation. Such delay, far from conforming with NCNB's avowed obligation of acting according to a basic honesty-duty of good faith toward Perry Brothers, reflected conscious, callous disregard for Perry Brothers' rights, interests, and legitimate expectations.

7. NCNB's subsequent, surprise *refusal* to renew Perry Brothers' line of credit following maturity in July, 1989 was not motivated by good faith, reasonable banking concern about Perry Brothers' financial condition or the company's ability to service its debt. Rather, this refusal was driven by an internal bank policy of "putting" as many loans as possible into NCNB's "Special Asset Bank" (the division of NCNB for "bad risk" credits)—in order to receive compensation from the Federal Deposit Insurance Corporation (hereinafter referenced as the FDIC) for the bank's private management of the loans.[2]

8. NCNB acted arbitrarily and in bad faith in rapidly, without warning, downgrading and classifying the Perry Brothers credit as "substandard" in September, 1989, and in "putting" the Note into the Special Asset Bank in March, 1990.

9. Perry Brothers executed the September 1989 loan documents in issue (which were

---

**2.** NCNB Texas National Bank entered into an agreement with the FDIC to manage—on behalf of the FDIC—a Special Asset Bank (for "bad" or "high risk" credits), within NCNB Texas.

made effective July 31, 1989) under duress—*i.e.*, as a result of the economically coercive and threatening behavior of NCNB. NCNB knew that Perry Brothers was vulnerable to such coercion at that time, lacking means to protect itself from the bank's threatened actions without incurring substantial harm because of an economic predicament fostered by NCNB which made it then virtually impossible for Perry Brothers to obtain alternative financing. The NCNB-fostered conditions creating this Perry Brothers duress continued to exist past the maturity date of January 31, 1990, and lasted throughout 1990.

10. NCNB's classification of the Perry Brothers Note as "substandard" in the fall of 1989 and its transfer of the Note to the Special Asset Bank in the Spring of 1990 was communicated to vendors and others with whom Perry Brothers did or sought to do business who routinely made inquiry of NCNB regarding Perry Brothers' credit strength—which effectively conveyed false, misleading, and disparaging information about the company to these third parties, resulting in substantial damages to Perry Brothers. In this respect, the Court credits especially the testimony of Perry Brothers' Chairman Ray Baldwin, Perry Brothers' President and Chief Operating Officer Jack Simpson, and Arthur Temple of the T.L.L. Temple Foundation—each of whom attested to the fact that the "putting" of the Perry Brothers Note into the Special Asset Bank disparaged Perry Brothers' good business name. The Court credits also the statement of Stanley Knitting Mills, Inc., to the effect that one of the reasons it withdrew its credit from Perry Brothers was that Perry Brothers' loans were in the "high risk" section of NCNB.

11. Perry Brothers was induced by NCNB to execute the August 31, 1990 nego-

tiation letter in issue without consideration—by vice of the bank's dishonesty and coercion.

12. NCNB–Lufkin and NCNB's Special Asset Bank division promised Ray Baldwin of Perry Brothers in 1990 that during the parties' workout negotiations, NCNB would not exercise control over the Perry Brothers checking accounts and would not take the company's money (*i.e.*, "setoff" Perry Brothers' bank accounts). These promises constituted misrepresentations of NCNB's actual intentions, and were made merely to induce Perry Brothers not to move its large, profitable, depository accounts to a competitor bank—thereby removing the funds from NCNB's ready reach. Perry Brothers reasonably relied on these promises, ultimately to its substantial detriment, by continuing to deposit funds in its NCNB accounts and utilizing the bank's "ACH" cash concentration system while the company negotiated in good faith with NCNB.[3]

13. The subsequent actions of NCNB—in freezing accounts and seizing the funds of Perry Brothers on November 27–28, 1990—were done to maximize the personal (illicit) profits desired by NCNB and its individual officers, with conscious disregard for the holiday-season, economic effect on Perry Brothers (with whom it had promised to deal in good faith). These actions were taken with deliberate indifference to the rights, interests and legitimate expectations of Perry Brothers.

14. Indeed, throughout 1988, 1989, and 1990, NCNB maintained a "hidden agenda" in its dealings with Perry Brothers, pursuant to which it often told Perry Brothers one thing with the intention of inducing Perry Brothers to remain a customer of the bank, while it internally implemented a contradictory strategy designed to force Perry Brothers' credit into the Special Asset Bank, where the bank might collect for itself as much money as possible, as fast as possible. The bank did

---

3. In 1984, RepublicBank–Lufkin solicited Perry Brothers to consolidate virtually all of the company's banking business through the bank's "Automated Clearing House" ("ACH") "cash concentration system." Perry Brothers did move its general checking account from Mercantile Bank to RepublicBank–Lufkin, and started participating in the ACH system. Under this system, de-

posits in Perry Brothers' various store accounts were transferred at Perry Brothers' request via the bank's wire transfer network—into Perry Brothers' general account at the bank's Lufkin branch. This use by Perry Brothers of the ACH system continued through NCNB's taking over for the failed First RepublicBank–Lufkin.

**1258**

this even though it knew Perry Brothers was relying on NCNB's promised good faith and even though it knew the line of credit was essential for Perry Brothers' business.

15. On or about November 28, 1990, NCNB returned unpaid ("bounced") approximately $130,000 in checks drawn on Perry Brothers' NCNB checking accounts. However, at the time these checks were presented to NCNB, Perry Brothers' accounts contained sufficient funds from which the checks could and should have been paid.

16. Again, NCNB disparaged the business reputation of Perry Brothers by conducting itself in a manner falsely informing many of the company's associates and would-be associates:

(a) Perry Brothers' Note was in the Special Asset Bank (i.e., the bank for "bad risk" credit);

and

(b) Perry Brothers had "insufficient funds" in its checking accounts on or about November 27–28, 1990 to cover the checks drawn by Perry Brothers.

17. Perry Brothers has proved by the preponderance of the evidence that it has suffered actual economic harm, proximately caused by the actions of NCNB and reasonably foreseeable to NCNB, in the amount of at least $6 million—as well as additional damages in terms of litigation costs (including reimbursements for such costs the company now owes the FDIC under the Note), and the default, prejudgment-interest-rate differential Perry Brothers must now pay the FDIC on the Note.

18. In short, having heard and viewed the evidence and reviewed the record, the Court is not persuaded by NCNB's efforts to discredit the above-referenced evidence and argument that Perry Brothers was not harmed in any discernible way by the bank's pattern of wrongful conduct toward the company and the company's line of credit. The bank's own internal documents belie the bank's position: these documents acknowledge that the com-

pany's line of credit was "essential for the company to stay in business." The Court finds that $6 million represents a reasonably certain, indeed conservative, determination of the actual basic economic damages suffered by Perry Brothers as a result of the bank's sweeping wrongful actions against the company—with the litigation costs incurred by the company (including such costs the company now owes the FDIC under the Note), and the default, prejudgment-interest-rate differential Perry Brothers must now pay the FDIC on the Note, being additional damages borne by Perry Brothers by vice of the bank's misconduct toward the company.

19. Nonetheless, the Court finds that NCNB did not act with such wanton disregard for the rights of Perry Brothers as to warrant the Court's imposition of exemplary damages.

20. The FDIC is the current holder of the Note in issue.

21. Because the FDIC did not encourage, cooperate in, or ratify NCNB's wrongful actions toward Perry Brothers, the FDIC is entitled to recover from Perry Brothers the outstanding principal due on the Note ($1,215,664.12); prejudgment interest on this sum at the default rate of interest (of 17%), accruing from and after November 29, 1990; [4] as well as the reasonable attorneys' fees and other costs associated with the holder's efforts to collect on the Note—which the parties have stipulated on the record during the proceedings in this case to be in the amount of $250,000.00.

22. Perry Brothers is entitled to recover from NCNB the excess, default-prejudgment-interest-rate differential the company must pay the FDIC; the FDIC Note-collection attorneys' fees and costs the company must pay the FDIC (stipulated as $250,-000.00); and the reasonable attorneys' fees and costs the company has personally incurred in this litigation. These are all further actual damages borne by Perry Broth-

4. The principal amount due the FDIC is the amount remaining after the setoff of Perry Brothers' account. It is undisputed that payments were not made by Perry Brothers—of principal or interest—after November 28, 1990. And the parties have agreed that prejudgment interest on the principal amount owed the FDIC on the Note in issue should properly accrue *from and after November 29, 1990.*

ers proximately and foreseeably caused by vice of the wrongful acts of NCNB.

## II.

### *Legal Analyses and Conclusions of Law*

To some extent, additional factual development is necessary for full legal analysis in this case. To this extent, the facts are developed more fully during the course of the following legal analyses and conclusions of law.

### A. *Good Faith and Fair Dealing*

▮ 1. By the preponderance of the evidence, Perry Brothers has established its good faith and fair dealing claims against NCNB. While the relationship between debtor and creditor alone does not lend itself to a general imposition of the duty of good faith and fair dealing, Texas courts nonetheless recognize that a duty of good faith and fair dealing may arise:

(a) by agreement;

(b) in particular circumstances, between the parties as a result of a long-standing, special relationship of trust and confidence between them (although mere subjective intent alone cannot so create the duty of good faith and fair dealing); and

(c) may arise when an imbalance of bargaining power exists—at least when the defendant is responsible for the imbalance.

All three situations existed in this unusual banking case, as Perry Brothers has established the following facts:

(a) Perry Brothers and NCNB agreed to deal with each other in the spirit of good faith and fair dealing;

(b) NCNB *expressly agreed* to continue the well established course of dealing that had typified the relationship between Perry Brothers and First RepublicBank–Lufkin; and

(c) *as a result of* Perry Brothers' reliance or dependance upon NCNB's promises, an imbalance of bargaining power was subsequently created and exploited by NCNB—after the company's line of credit was not renewed at its maturity on July 31, 1989 and the Note was transferred to the Special Asset Bank in the Spring of 1990.

▮ 2. The answer to the question of whether such a duty exists in a particular case depends on the factual setting and the interplay of factual and legal questions. For example, a duty of good faith and fair dealing arises as a matter of law in the insurance context because of the generally unequal bargaining power between the insurer and the insured, and the nature of insurance contracts themselves—a couplet of inherent circumstances in the particular context that would allow unscrupulous insurers to take advantage of their insured's misfortunes in bargaining for settlement or resolution of claims absent the general recognition of such a duty in the insurance context. *See Arnold v. Nat'l County Mutual Fire Insurance Co.,* 725 S.W.2d 165, 167 (Tex.1987). But the insurance context is but one example of a context in which the duty of good faith and fair dealing may arise.

▮ 3. Most critical in this unusual banking case are the facts found by this Court that:

(a) NCNB promised to assume the role (and the obligations associated with the role) of its predecessor failed bank, with which Perry Brothers had established a longtime, special relationship—so as to, for example, renew Perry Brothers' line of credit after maturity on essentially the same terms as set forth in the 1988 loan documents with First RepublicBank–Lufkin (unless the company experienced material, unanticipated, adverse changes in its financial condition); and

(b) NCNB specifically promised to deal with Perry Brothers in good faith (basic honesty) as the failed First RepublicBank–Lufkin had.[5]

---

**5.** It is noteworthy, as to the reasonableness of Perry Brothers' believing the bank's promise, that the president and senior vice president/loan officer with whom Perry Brothers had been dealing in good faith and fair dealing when the bank was First RepublicBank–Lufkin remained in their respective roles when NCNB took over for the failed First RepublicBank.

Because of NCNB's assumption of these obligations toward Perry Brothers, the relationship between Perry Brothers and NCNB was an extraordinary banking relationship—one clearly marked by the parties' *shared trust. Compare Security Bank v. Dalton,* 803 S.W.2d 443, 447 (Tex.App.—Ft. Worth 1991, writ denied) ("The [Texas Supreme] Court has consistently held . . . that a duty of good faith is not imposed *in every contract,* but rather, only in special relationships marked by shared trust or an imbalance of bargaining power.").

■ 4. Thus, while it is true that the general relationship between a borrower and its lender does not by itself give rise to a duty of good faith and fair dealing, such a special relationship in the banking context may arise in unusual cases such as this one. *Compare e.g., FDIC v. Coleman,* 795 S.W.2d 706, 708–709 (Tex.1990).

5. The longstanding, special relationship of trust and confidence between Perry Brothers and NCNB's predecessor banks, and NCNB's own embrace of that relationship, are reflected in NCNB's internal memoranda introduced at trial. As early as 1989, NCNB's own records articulate as justification for the renewal of the company's credit: *NCNB's* longstanding profitable relationship with the company and its principals; these records refer to Perry Brothers as an "NCNB borrower" for "5+" years.

6. Trial testimony further revealed that NCNB ratified and assumed the duties arising from the longstanding, special Perry Brothers/First RepublicBank–Lufkin relationship. This case is thus different from such cases as the Texas Supreme Court's *Coleman* case and the 1991 Texas Court of Appeals' *Security Bank* case; in contrast to those cases, Perry Brothers has pleaded and established by the preponderance of the evidence that NCNB affirmatively embraced the longstanding, special relationship that had existed between Perry Brothers and NCNB's predecessor, First RepublicBank.

7. One key feature of the ongoing, special relationship between the company and NCNB was the bank's knowledge that Perry Brothers had embarked on a multi-year restructuring of its operations, and thus, that the company would be vulnerable until the transition was completed. NCNB's records substantiate Ray Baldwin's testimony that he discussed with the bank's officers his plans for the restructuring and modernization of the company (which transition would necessitate "cash flow" management through the transition period, rather than an emphasis on operating profits), and that the bank approved of this plan of Baldwin's. NCNB–Lufkin's (and formerly, First RepublicBank–Lufkin's) President, William Zbranek, further confirmed that Ray Baldwin discussed these plans with him on several occasions. And, consistently, comments in the bank's records confirm the bank's recognition that the "[l]ine of credit is essential for [Perry Brothers] to stay in business." Perry Brothers' Exhibit 62B (NCNB (credit) "Pool Transfer" documentation).

■ 8. Perry Brothers has proved by a preponderance of the evidence that NCNB failed to treat the company with simple honesty in fact. NCNB's "hidden agenda" in dealing with Perry Brothers is evidenced by the bank's discouragement of Perry Brothers from seeking alternative financing in April, 1989, even though the bank had in fact secretly adopted a credit strategy of "decrease" in the just-previous month. The bank's dishonesty is further evidenced by its affirmative assurances to Perry Brothers in 1990 that the bank would not setoff the company's checking accounts while the parties were engaged in workout negotiations, when in fact, at the same time, the bank was busy monitoring the balances in the company's "cash concentration system" account and developing plans for executing a setoff so as to maximize its own collections before the end of the year. NCNB's efforts to maximize its collections from the company before the end of the year were driven by a yet-heightened, self-interested quest to maximize its compensation under a new, non-public agreement with the FDIC in July of 1990; and in particular by bank officers' desires to collect up to one third (⅓) of their annual salaries in bonuses from the bank for accomplishing particularly large quantities of collection.

9. The bank's hidden, deliberate disregard for Perry Brothers' rights, interests

and legitimate expectations is illuminated by consideration of the conflicting (*i.e.*, overt versus covert) bank conduct relative to the two, successive Perry Brothers "Loan Applications" of August and September of 1989. Particularly telling are the "Officer's Comments" attached to these two documents.

10. The first such commentary—submitted on August 9, 1989 by NCNB–Lufkin's (and formerly First RepublicBank–Lufkin's) Senior Vice President and account officer for Perry Brothers, Mark Reily, recommended the "annual reaffirmation of the company's line of credit ... on basically the same terms as previously approved" in 1988. This renewal was given a "Pool Placement Code" of "XR"—meaning that it would be "no longer eligible for transfer to the 'Special Asset Bank.'" However, this first application was declined by NCNB officers Larry Beaumont and Joe Bailey in Houston, Texas on August 15, 1989. The second application was submitted by Mark Reily on September 5, 1989—following consultation with the Houston NCNB officers regarding renewal terms they would find acceptable. The second application set forth several enhancements of the bank's position that were subsequently actually reflected in the loan agreement that was signed (under duress) by Perry Brothers in late September, 1989 (made effective July 31, 1989). These enhancements included: taking as collateral the company's unencumbered inventory (valued at cost of $19.5 million as of January 31, 1989); shortening the maturity date to January 31, 1990; reducing the total available credit from $3 million to $2.5 million; and changing the Note from a "revolving" credit to a "Non–Readvancing Demand Note"—all of which severely restricted the company's operational and modernization/transition flexibility. The revised Note was to be given a "Pool Placement Code" of "P"—meaning that the credit remained eligible for transfer into the Special Asset Bank. The minutes of the October 26, 1989 meeting of NCNB's Credit Review Committee consist of one simple comment which epitomizes NCNB's hidden but actual single-minded, self-interested approach to the Perry Brothers Note: "Recent renewal structured to retain 'Put' option." Unknown

to Perry Brothers, this "put" option had become all-important to NCNB.

11. NCNB soon showed itself to really want more than simply to retain the "put option." NCNB insisted on labelling the Perry Brothers Note a "classified credit" eligible to be "put" essentially "at once" into the Special Asset Bank. To accomplish this, though, NCNB had to arbitrarily downgrade Perry Brothers' Note from a "7" ("watch") to a "9" ("substandard") credit rating. The course of this arbitrary process has been established by several internal NCNB documents.

12(a). Perry Brothers' credit was "graded" by First RepublicBank as a "4" in July 1987, and was deemed a "5" in May 1988. (While the First RepublicBank–Lufkin rating scale differed somewhat in terms of specific numerology from the NCNB system, these lower, "4" and "5" number grades were considered satisfactory or "passing" under the First RepublicBank rating system.)

12(b). NCNB's initial credit rating of Perry Brothers' Note occurred in January 1989, when the Note was graded "6/A," meaning "Adequate." *See* Perry Brothers Exhibit 198 (the "A" was a "placement code" indicating to the bank that this was a "good asset ... recommended for the Operating Bank's portfolio").

12(c). By March 1989, after receiving preliminary results of the company's fiscal year ending January 31 of that year, NCNB–Lufkin recommended that the Note be downgraded one level, to a "7." The "7" grade reflected that the Note was a "watch" credit, and triggered an internal bank requirement that quarterly "Scheduled Asset Reports" be prepared by the responsible account officer (in Lufkin), and reviewed by his supervisors and the Credit Review Committee (in Houston). Accordingly, the "7" credit grade in March, 1989 was approved by at least three levels of bank authority above the local officer Mark Reily—including the Credit Review Committee. After both reviews, Perry Brothers' credit grade remained a "watch." And the Credit Review Committee approved this satisfactory grade until August 16, 1989.

12(d). In accordance with these recent, full review approvals, the Loan Applications prepared by the local officer, Mark Reily, in August and September 1989 both reference Perry Brothers' Note as a "7" in terms of credit risk—and both contain the following explanatory comments as part of the "Reasons for Recommendation:"

> This recommendation is made after careful consideration to this credit, especially in light of its classification as a "watch" credit and its size relative to the Lufkin Banking Center. NCNB Lufkin assumes that this credit will remain a "watch" credit for the upcoming year and accordingly, has included it in all credit quality statistical projections.

12(e). Still, this "7" credit rating was to become inadequate to satisfy the bank's true, hidden desires—because a "watch" credit could not be "put" all the way to the FDIC by the end of the year. Only "classified" notes (*i.e.,* those graded either a "9" or a "10") qualified for such a final "put."

13. On September 18, 1989: notwithstanding the overt assurances Perry Brothers received from the bank, after the line of credit had been drastically restructured to enhance the bank's position, two members of the Credit Review Committee without a good faith reason overruled all the previous Note gradings by the bank and dropped the grade on the Perry Brothers Note by two full levels—to a "9" or "substandard" level. Upon receipt of the memorandum from the Committee, Larry Beaumont testified, he marked through the typed "7" on the front of the Loan Application, wrote in a "9," and replaced the "Maintain" Exposure Strategy with a handwritten "Out." Unknown to Perry Brothers, its fate had been thus arbitrarily determined by NCNB.

14. Trial has revealed that the Committee's memorandum contains no information not previously considered, and that it does not identify any "recent events" to account for the drastic, immediate change in the credit rating on the Note. Tellingly, the memorandum does not explain the drop of two grades in one month, despite the provision in the FDIC assistance agreement with the bank that any credit with the potential to drop two or more risk ratings should be designated as a "Vulnerable Borrower," and the fact that none of the Scheduled Asset Reports for Perry Brothers in 1989 had so designated the Note. According to NCNB's own policies, bank officers were supposed to *anticipate* significant credit deterioration which implied the real potential for a borrower to decline in risk rating status by two or more categories or move into criticized status over the life of the bank's credit exposure. "Criticized status" covered loans rated between "8" and "10." The memorandum makes no attempt to harmonize its substandard loan grade with the conclusions contained in the loan application previously approved by at least three other loan officers more familiar with the Perry Brothers credit, which had stated:

> 2. At this time, there appears to be limited (if any) loss exposure related to the credit. . . .
>
> \* \* \* \* \* \*
>
> 4. NCNB Lufkin is confident that its loan agreement and its collateral position will protect the bank from any further substantial deterioration within the company by virtue of various financial covenants.

Indeed, the substandard loan grade and the loan application conclusions *cannot* be harmonized. The risk of loss, of either principal or interest, related to the borrower's inability to maintain an orderly debt service was *supposed to be* an essential element of a (proper) "9" credit grade. "Loss" was defined as "uncollectible." The Perry Brothers debt did not present this sort of risk. NCNB showed itself to be simply interested in something other than its properly-professional, avowed concern with "limited loss exposure."

15. As a "classified" credit, Perry Brothers' Note could be transferred to the Special Asset Bank—where it would be "managed" for compensation on behalf of the FDIC. Thus, once NCNB had "put" the Note into the Special Asset Bank, the bank obtained the object of its now-exposed true desires—special compensation from the FDIC for managing a "vulnerable" asset (irrespective of the fact that no real risk was actually presented by the Perry Brothers credit). Ir-

respective of any other banking guidelines regarding such a credit, NCNB's true, internal agenda had become one of encouraging its officers to "put" as many credits as possible, as fast as possible. The "put" process was begun in the case of Perry Brothers' Note as soon as possible after the Note matured at the end of January, 1990. (The Note was "put" into the Special Asset Bank in March, 1990.)

16. After the Note was put into the Special Asset Bank, no one from the bank contacted Perry Brothers regarding payment, extension, or workout of the Note. And Perry Brothers was not notified as to who would be responsible for handling its accounts. Indeed, no contact was made until Perry Brothers learned that the bank had refused to honor certain of the company's checks and internal transfers in early July, 1990 and the company sought to discuss this situation with the responsible bank officers. Perry Brothers' Ray Baldwin found himself directed to Jeff Dangremond at the Special Asset Bank. Baldwin arranged for a meeting with Dangremond in Dallas. This meeting took place on July 19, 1990. In discussing control of the company's checking accounts, Dangremond assured Baldwin that NCNB would not setoff these accounts against the Note while the parties were negotiating a workout of the situation. This assurance was false.

17. Unknown to Perry Brothers, the NCNB–FDIC Assistance Agreement had been amended, effective July 1, 1990, so that NCNB's compensation for managing notes through its Special Asset Bank would be based on a percentage of gross collections plus an escalating fee of three to seven percent of net cash collections. Within two weeks, NCNB had in place a 1990 profitability and retention incentive plan—designed to maximize "collection objectives." This plan created an employee "bonus pool," funded according to "overall net cash collections." The first item on the bank's bonus appraisal form was "contribution to cash collections." The Special Asset Bank also started circulating monthly "score cards" monitoring cash collections for each officer and the various bank districts, on both a monthly and year-to-date basis.

18. Not surprising: the bank's express representations to Perry Brothers notwithstanding, two weeks after the new bonus plan went into effect a young credit analyst with the Special Asset Bank under the supervision of Jeff Dangremond (Jamey Fisher) reviewed the Perry Brothers file, and then circulated a memorandum recommending that the bank "immediately freeze or offset all eligible accounts." This recommendation was in fact officially implemented four months later, before the end of the year, on November 27–28, 1990 (regardless of the obvious, especially critical (holiday) time of the year for a general merchandising business like Perry Brothers). NCNB seized approximately $1.3 million from the Perry Brothers checking accounts that had been consolidated through the bank's ACH cash concentration system. This was a "record setoff." It netted for Dangremond a year-end, $14,000.00 bonus according to the Bonus Appraisal Form completed by his supervisor, Karen Sobey. Ms. Sobey herself received a bonus for the year of $20,000.00. And her supervisor, Randy Brown, received a $30,000.00 year-end bonus.

19(a). It is clear to the Court that NCNB's ability to implement its wrongful, hidden collection agenda against Perry Brothers depended on at least three key factors:

(i) the company had to be induced to retain its depository accounts with NCNB and continue its use of the NCNB "ACH," cash concentration system;

(ii) the company's accounts had to be closely monitored in order to maximize recovery from a setoff; and

(iii) approval for the setoff had to be obtained from NCNB supervising officers and legal counsel.

19(b). *The Inducement of Perry Brothers to Retain Its Accounts With NCNB, Specifically*

(i) Jeff Dangremond assured Ray Baldwin that the Special Asset Bank would not exercise control over the company's checking accounts while the parties were engaged in

workout negotiations with respect to the Note. And in the month following this assurance, another NCNB officer, Suzanne Stewart, visited the company's corporate office in Lufkin to discuss the ACH cash concentration system and to encourage the company to start making its cash transfers through a PC-based system (*i.e.*, to replace the utilization of mere telephones). Then, after the parties exchanged one round of offers and counter-offers on the Note, Dangremond continued to act as if the bank intended to negotiate a mutually satisfactory agreement. Indeed, even after he had actually sought approval to conduct a setoff, on November 20, 1990, Dangremond still led Baldwin on by assuring him on November 23, 1990 that the bank was interested in further discussion of workout terms, and Dangremond agreed to get together with Baldwin to continue negotiations on the matter when Baldwin returned from vacation on the Wednesday following Friday, November 23, 1990—on November 28, 1990. But, by the time Baldwin returned to his office on November 28, 1990, the bank's setoff process was well underway. Also on November 28, 1990, the bank filed a lawsuit against the company in Dallas (state) district court—seeking full recovery of the indebtedness reflected in the Note.

(ii) Especially telling as to NCNB's true intentions in inducing Perry Brothers not to remove its funds from NCNB's grasp is the timing of the letter purporting to terminate negotiations between the bank and Perry Brothers. Although NCNB Officers Dangremond, Sobey, and Brown all testified that they considered Perry Brothers' counter-offer of November 5, 1990 to be "ridiculous" and even to have been offered in "bad faith," the bank did not decide to decline this offer until November 19, 1990, and even then gave no indication that workout negotiations were deemed by the bank to be at an impasse—until after a "restriction code" had been placed on the company's bank accounts (ef-

fectively freezing them) on November 27, 1990. Finally, NCNB notified the company that it was terminating negotiations by a letter dated November 27, 1990 but which was not received by Perry Brothers for a day or two. *Cf.* Perry Brothers Exhibit 199, at 04–05.013(2)(b) (Special Asset Bank Credit Policy Manual regarding NCNB's supposed "self-imposed" policies of good faith in it dealings) (recognizing that good faith requires written notice to borrowers before the bank undertakes any "significant change in the status of a loan relationship"—such as, for example, acceleration or foreclosure).[6]

### 19(c). *The Monitoring of Perry Brothers' Accounts for the Bank's Own Maximum Gain*

The second key to the bank's setoff scheme was NCNB's monitoring of the company's accounts so as to maximize the bank's recovery for amounts seized. Jeff Dangremond credited Jamey Fisher for his initiative in this respect, and considered Fisher's efforts "invaluable" to the bank's setoff strategy. Although Dangremond and Sobey testified that the monitoring of Perry Brothers' accounts did not begin until after the bank received Baldwin's counter-offer of November 5, 1990, the bank's own records refute this claim. On September 6, 1990, Dangremond reported that "PBI often keeps over $1 million in the bank through its cash management accounts." The setoff proposal in the July 26, 1990 memorandum emphasizes the company's sizeable accounts at NCNB. And the July 19, 1990 meeting between Baldwin and Dangremond was in fact prompted by the Special Asset Bank's decision to return checks drawn on these sizeable accounts.

### 19(d). *Obtaining Approval for the Setoff*

The third key aspect of the bank's setoff scheme involved the actual obtaining of approval for the setoff—which required the justifying of such action as superior to alternatives. One obvious obstacle to the scheme, though, was the fact that the $2.5 million

---

6. In accordance with the Assistance Agreement between the FDIC and NCNB Texas National Bank ("NCNB Texas")—for NCNB Texas to manage, on behalf of the FDIC, a Special Asset Bank within NCNB Texas—the NCNB Special Asset Bank developed this operations manual for the bank, setting forth the (supposed or purported) policies, procedures and rules governing the organization, operations, credit risk evaluation, litigation, reports and accounting systems of the Special Asset Bank.

Note was more than adequately secured by $19.5 million in unencumbered Perry Brothers inventory. Jeff Dangremond evaded this problem by grossly misrepresenting the value of Perry Brothers' collateral. While the extent to which the audited book value (at cost) should be "discounted" in order to reach a "liquidation value" is at least to some degree debatable, it is nonetheless beyond question that there were no "filed purchase money liens" encumbering any portion of Perry Brothers' inventory—contrary to Dangremond's assertion. This fact is readily apparent from a review of the bank's own files. The loan agreements signed in 1989 expressly provide that the inventory was unencumbered, and would remain so. The company's balance sheets reveal no short-term liabilities that would accompany such liens. And most telling, the bank had commissioned two U.C.C. searches and obtained records of all liens filed against the warehouse (T.L.L. Temple Foundation), certain equipment (General Electric, Sensormatic Corp.), and consignment merchandise (Malone & Hyde, Action Industries)—but the only lien against the company's *inventory* was that filed by NCNB itself. Jeff Dangremond's subtraction from the collateral value of $8 million, $5 million, or any amount at all for these obviously nonexistent "purchase money liens," cannot be fairly regarded as anything less than flagrant misrepresentation of a material fact, calculated to accomplish the bank's own covert desire of justifying its illicit seizure of the company's cash for the bank's personal gain rather than continuing the parties' workout negotiations.

20. NCNB's conduct in the above-described respects also violated provisions of the Uniform Commercial Code as adopted in Texas (Texas U.C.C.), in connection with the ACH "cash concentration system" and the company's depository accounts. The Texas U.C.C.'s § 1.203 states that "[e]very contract or duty within this title imposes an obligation of good faith in its performance or enforcement." TEX.BUS. & COM.CODE ANN. § 1.203. *See generally Central Savings & Loan Ass'n v. Stemmons Northwest Bank*, 848 S.W.2d 232 (Tex.App.—Dallas 1992, no writ).

21. A breach of the duty of good faith and fair dealing—even when the duty arises from a contractual relationship between the parties—is an independent tort capable of giving rise to tort damages. *See e.g., Viles v. Security Nat'l Insurance Co.*, 788 S.W.2d 566, 567 (Tex.1990). *Compare National Union Fire Ins. Co. of Pittsburgh, Pa. v. Care Flight Air Ambulance Service, Inc.*, 18 F.3d 323, 326–328 (5th Cir.1994); *id* at 328 ("Given the record before the court and the Texas law, the district court correctly found that the fact that Care Flight breached its lease contract did not preclude a finding that Care Flight also committed the tort of conversion."). Damages for a breach of this duty are those resulting from the bad faith acts constituting the breach. *See e.g, Izaguirre v. Texas Employers' Insurance Ass'n*, 749 S.W.2d 550, 553 (Tex.App.—Corpus Christi 1988, writ denied).

## B. *Breach of Contract*

1. The contract that Perry Brothers has established by the preponderance of the evidence NCNB breached is the one between Perry Brothers and NCNB to the effect that NCNB would renew Perry Brothers' line of credit with the same basic terms already established through the 1988 Note, with minor modifications from year to year—*unless* Perry Brothers suffered a major deterioration of its ability to repay the Note on a timely basis. Thus, the basic terms of the line of credit NCNB promised Perry Brothers were those already clearly set forth in the 1988 Note.

2. NCNB has contested Perry Brothers' breach of contract claim(s) against the bank on grounds of uncertainty. But the test in Texas relative to requisite contractual certainty is whether the alleged contract is sufficiently certain to enable the Court to determine the legal obligations of the parties. *See e.g., Bendalin v. Delgado*, 406 S.W.2d 897, 899 (Tex.1966); *see also Mesa Petroleum Co. v. Coniglio*, 629 F.2d 1022, 1026–1027 (5th Cir.1980). The facts disclosed through trial prove the contract in issue was sufficiently certain. Also, these facts prove that it was foreseeable that Perry Brothers would rely on NCNB's promise; and that it was

reasonable for Perry Brothers to have so relied.

■ 3. Damages for breach of contract are those losses that are the "natural, probable, and foreseeable consequence of the defendant's conduct." *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 687 (Tex.1981).

## C. *Economic Duress*

■ 1. By the preponderance of the evidence, Perry Brothers has established its duress assertion against NCNB. Under Texas law, duress consists of the following elements:

(a) a threat to do something the party threatening has no legal right to do;

(b) some illegal exaction or some fraud or deception by the threatening party; and

(c) restraint so imminent that it destroys the free agency of the threatened party to such an extent that the threatened party is without means to protect herself.

*See e.g., Simpson v. MBank Dallas*, 724 S.W.2d 102, 109 (Tex.App.—Dallas 1987, writ ref'd n.r.e.). While the question of what constitutes duress is a matter of law, the question of whether duress actually existed in a particular case is generally, as in this case, a question of fact. *See e.g., Bank of El Paso v. T.O. Stanley Boot Co.*, 809 S.W.2d 279, 289 (Tex.App.—El Paso 1991), *aff'd in part, rev'd and rendered in part (on other grounds)*, 847 S.W.2d 218 (Tex.1992). As addressed above, in the Court's findings of fact, NCNB's conduct in this case went well beyond the simple assertion of the bank's right to payment of the balance of the 1988 credit line. Having promised Perry Brothers that it would renew the credit line prior to its July 1989 maturity, and having expressly discouraged Perry Brothers in April 1989 from seeking alternative financing, NCNB *created a situation* where the company was no longer in a position where it could adequately protect itself from the bank's unreasonable demands for drastic modifications in the parties' credit arrangement. For instance, in September, 1989, the bank did not have the right to threaten to call down the entire obligation, place Perry Brothers in

breach of the Temple Foundation Note, and effectively destroy the company's credit reputation in its industry. Indeed, the economic duress under which Perry Brothers found itself was largely due to its reasonable, good faith reliance on *the bank's* duty of good faith and fair dealing and the bank's express promises to Perry Brothers that it would renew the company's critically-important line of credit. In short: NCNB is responsible for the economic duress suffered by Perry Brothers. Through its deceptive promises, NCNB created a situation in which Perry Brothers was no longer capable of adequately protecting itself from the bank's subsequent unreasonable, unconscionable demands in September, 1989 for drastic modifications in the company's credit arrangement. And only under duress did Perry Brothers acquiesce in the bank's September, 1989 credit arrangement demands.

2. Unpersuasively, NCNB has taken the position that even if Perry Brothers entered an agreement with the bank under duress, Perry Brothers ratified the agreement by executing the second negotiation agreement—after NCNB setoff Perry Brothers' accounts. However, under the circumstances of this case, clearly neither the August 31, 1990 negotiation letter *nor* the subsequent December 3, 1990 letter operates to waive, release, or ratify NCNB's wrongful conduct.

■ 3. In short, NCNB has wholly failed to demonstrate the existence of either of the elements of ratification, which are:

(a) the removal of the conditions causing Perry Brothers' duress; and

(b) an intent on the part of Perry Brothers to ratify.

*See e.g., United States v. McBride*, 571 F.Supp. 596 (S.D.Tex.1983) (citing *Barnette v. Wells Fargo Nevada Nat'l Bank of San Francisco*, 270 U.S. 438, 46 S.Ct. 326, 70 L.Ed. 669 (1926)), *aff'd*, 915 F.2d 1569 (5th Cir.1990).

■ 4. In light of the Court's above findings and analysis regarding the duress inflicted upon Perry Brothers by the bank, the company is relieved of the obligation it assumed under this duress. *See e.g., State*

*Nat'l Bank of El Paso v. Farah Mfg. Co.*, 678 S.W.2d 661, 683 (Tex.App.—El Paso 1984, writ dism'd per parties' settlement).

### D. *Promissory Estoppel*

 1. Perry Brothers has also established by the preponderance of the evidence that it is entitled to equitable remedies under the doctrine of promissory estoppel. The elements of promissory estoppel are:

(a) a promise;

(b) the foreseeability of the promisee's reliance; and

(c) actual, reasonable, substantial reliance by the promisee on the promise, to the promisee's detriment.

*See English v. Fischer*, 660 S.W.2d 521 (Tex. 1983). Promissory estoppel may be asserted when one party makes a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, which does induce such action or forbearance; and when injustice can be avoided only by enforcement of the promise. *See e.g., Fretz Construction Co. v. Southern Nat'l Bank*, 626 S.W.2d 478 (Tex.1981); *Sipco Services Marine, Inc. v. Wyatt Field Service Co.*, 857 S.W.2d 602 (Tex.App.—Houston [1st Dist.] 1993, no writ). The party seeking this equitable remedy has the burden of proof, and the failure to prove any element is fatal to the promissory estoppel claim.

2. Perry Brothers has established that NCNB made promises to Perry Brothers, which, foreseeably, were to be reasonably relied upon by Perry Brothers (and which were so reasonably and substantially relied upon by Perry Brothers to the company's substantial detriment); and Perry Brothers has established that injustice can be avoided in this case only by enforcement of these NCNB promises to Perry Brothers. For example, Perry Brothers has established that NCNB's promise to the company that the bank would deal with Perry Brothers in a manner consistent with the long-time, special relationship between First RepublicBank and the company (*i.e.*, in accordance with good faith and fair dealing) falls within the scope of the promissory estoppel doctrine. Even more specific, Perry Brothers has established that the bank's promise to not setoff the company's accounts while the parties were involved in good faith workout negotiations falls within the scope of this doctrine. (NCNB's argument notwithstanding, the August 31, 1990 letter agreement does not foreclose Perry Brothers' promissory estoppel claim in this respect; the letter agreement is inapplicable to this promise by the bank not to setoff the company's accounts.)

 3. The law's remedial goal in the area of promissory estoppel is to allow the victim to recover those damages which have arisen by vice of the detrimental reliance by the victim on the promisor's averments—*i.e.*, those restitutionary measures necessary to put the victim back in the position he or she would have been in had the victim not relied on the broken promise in issue. *See Fretz Construction Co., supra*, 626 S.W.2d at 483.

### E. *Fraud*

 1. A party's contractual relationship may create duties under both contract and tort law. A party's actions may breach duties in contract or tort alone, or simultaneously in both. While simple failure to perform the terms of a contract yields only contract liability, not tort liability, a contract to perform in the future is also actionable fraud when a party makes the contractual promise with the actual present intention, design, and purpose of deceiving, and with no intention of actually performing. *See Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex.1986). *See also Schindler v. Austwell Farmers Cooperative*, 829 S.W.2d 283, 289 (Tex.App.—Corpus Christi) ("The general rule is that the failure to perform the terms of a contract is a breach of contract, not a tort. * * * However, a party who promised to do a future act with no intent to perform and with intent to deceive may be liable for fraud.") (citations omitted), *aff'd as modified*, 841 S.W.2d 853 (Tex.1992); *see also id.* at 289–291 ("Appellant cites *American Nat'l Petroleum Co. v. Transcontinental Gas Pipe Line Corp.*, 798 S.W.2d 274 (Tex. 1990) ... for the proposition that a distinct actual damage must be attributable to the

tort and not attributable to the breach of contract for the tort to survive. * * * Appellant ... relies heavily on Justice Gonzalez's dissent in *American Nat'l Petroleum.* Justice Gonzalez would have required the plaintiffs to prove a distinct tortious injury with actual damages. We are bound, however, only by the majority opinion. * * * [A]ppellant's argument that any tort committed in a contractual relationship must have a damage element independent of any damages suffered to the subject matter of the contract would completely eliminate fraudulent misrepresentation in procurement of a contract as a tort.") (citations omitted).

■ 2. The nature of the injury usually determines which duty is breached. Thus, when the injury is but the economic loss to the subject of a contract itself, the action sounds only in contract. *See Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617, 618 (Tex.1986).

■ 3. The elements of common law fraud are:

(a) that a material representation was made;

(b) that this material representation was false;

(c) that the speaker of the material representation knew it to be false when he or she made it, or, it was made recklessly without knowledge of its truth or falsity (at the time it was made) and yet made as a positive assertion;

(d) that the speaker made it with the intention that it should be acted upon the other party;

(e) that the other party acted in justifiable reliance upon the representation; and

(f) that the other party thereby suffered injury.

*See e.g., Trenholm v. Ratcliff,* 646 S.W.2d 927, 930 (Tex.1983); *Crim Truck & Tractor v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591, 597 (Tex.1992).

■ 4. Perry Brothers has established its fraud claim against NCNB by the preponderance of the evidence. The trial evidence has disclosed: that NCNB knowingly or recklessly made material false statements to Perry Brothers as if they were facts; that NCNB either knew these statements were false at the time it made them, or NCNB made them with reckless indifference as to whether these positive representations made to Perry Brothers were true or false; that NCNB made these representations with the intent that Perry Brothers rely and act upon them; that (quite justifiably,) Perry Brothers did so act in reliance upon these representations; and that Perry Brothers suffered significant injury because of its reliance upon these misrepresentations of NCNB's.

■ 5. NCNB committed fraud in 1988 when it represented to Perry Brothers that it would renew the line at maturity and would continue its predecessor's good faith dealings with Perry Brothers, when in fact it had no such intentions. NCNB committed fraud in 1989 when it discouraged Perry Brothers from seeking alternative financing and assured Perry Brothers that there would be no problem renewing the line of credit at maturity, while at the same time it was internally changing its credit strategy and preparing to dishonor these commitments to Perry Brothers. NCNB committed fraud when it represented to Perry Brothers in the Spring and Summer of 1990 that it would not exercise control over the company's checking accounts or take Perry Brothers' money while the parties were engaged in workout negotiations—when in fact the bank was secretly preparing to do just that.

■ 6. The law's objective in fraud cases is to compensate the defrauded party for his or her injuries (not to provide him or her with a "profit"). The true damage measure in every case of this kind is that which gives the defrauded party the actual amount of his or her pecuniary loss which directly and proximately resulted from the fraud practiced upon him or her. *See e.g., Morriss–Buick Co. v. Pondrom,* 113 S.W.2d 889 (Tex.Com.App.1938); *State Nat'l Bank of El Paso v. Farah Mfg. Co.,* 678 S.W.2d 661 (Tex.App.—El Paso 1984, writ dism'd per parties' settlement agreement).

## F. *Wrongful Setoff*

■ 1. Perry Brothers has established by the preponderance of the evidence that NCNB wrongfully setoff the company's accounts against the Note, and that such wrongful setoff has significantly damaged the company's ability to compete.

■ 2. The relationship of a bank to a depositor is contractual; it is that of a debtor-creditor arising from the depository contract. *See e.g., American Bank of Waco v. Waco Automotive, Inc.,* 818 S.W.2d 163 (Tex.App.—Waco 1991, writ denied). The nature of this relationship authorizes a bank to undertake the self-help, summary civil dispute resolution procedure of setoff of a debtor's deposits against a debt of equal amount owed the bank by that depositor. Setoff is not allowed unless there is actually a mature or past-due debt owed by the depositor to the bank. *See e.g., Bandy v. First State Bank, Overton, Texas,* 835 S.W.2d 609 (Tex. 1992).

■ 3. The Court's review of authorities reveals that beyond the debt maturity requirement, several procedural steps are necessary to the proper exercise of the bank's self-help setoff right:

(a) the decision by the bank to exercise the right;

(b) some action that accomplishes the setoff;

(c) some record which evidences that the right of setoff has been exercised; and

(d) in light of the essentially governmental (judicial) nature of a bank's setoff action, it is clear that at least contemporaneous notice of such a setoff to the depositor is necessary in order for the bank to avoid violating the depositor's rights under due process and/or the federal common law.

4. In addition to having given Perry Brothers inadequate notice of the setoff—*i.e.,*

in a manner offending Fourteenth Amendment due process and the federal common law—NCNB's setoff of Perry Brothers' accounts was wrongful for the following reasons:

(a) Because of its promises to, assumed obligations toward, and wrongdoing against Perry Brothers, NCNB enjoyed no enforceable contractual right to setoff the company's depository accounts that it might otherwise have enjoyed; its right to setoff thus derived solely from the equitable principles of the common law; [7]

(b) NCNB was estopped from exercising any common law equitable right of setoff by its prior promise not to exercise such right while the parties were negotiating a settlement of their dispute;

(c) NCNB was estopped from exercising any common law equitable right of setoff by its communications and conduct indicating that it was engaged in good faith workout negotiations, while it was actually surreptitiously formulating and implementing a strategy of seizing as much of Perry Brothers' deposited funds as possible immediately following the receipt of company sales proceeds from the Thanksgiving holiday;

(d) NCNB was estopped from exercising any common law equitable right of setoff by its own inequitable and deceptive behavior, including its breach of promises; misrepresentations of its intentions as late as November 23, 1990; ineffective and inadequate notice that it was terminating workout negotiations after freezing the accounts and immediately before seizing the funds; and its conscious disregard of the harm to be inflicted on its longstanding, special customer; and

(e) NCNB's setoff constituted a breach of its duty to Perry Brothers of good faith and fair dealing. [8]

7. It is noteworthy though that even NCNB's asserted contractual right to setoff Perry Brothers' accounts is so equivocal as to amount to a mere recitation of the bank's general rights in equity. *See* NCNB's Exhibit 2, at ¶ 5.2 (Non–Readvancing Line of Credit Loan Agreement of July 31, 1989; emphasis added) ("Nothing contained

herein shall be construed to limit or abridge the rights of offset that the Bank or other holder of the Note *may* have under applicable law upon the occurrence of any Event of Default or any Unmatured Event of Default.").

8. Indeed, beyond the general duty of good faith and fair dealing the bank promised and assumed

Perry Brothers has established by the preponderance of the evidence that the bank deliberately deceived the company as to whether or not the bank was going to setoff Perry Brothers' accounts. (Note also that the Texas U.C.C. defines good faith as "honesty in fact in the conduct or transaction concerned." *See* TEX.BUS. & COM.CODE ANN. § 1.201.)

*The Fourteenth Amendment (Due Process) and Federal Common Law Right to at Least Contemporaneous Notice of Bank Account Setoff*

▮▮▮ 5(a). With regard to due process in particular, the Court's conclusion as to the need for at least contemporaneous notice of bank setoff is informed by such well established precedent on self-help, involuntary summary dispute resolution procedures as *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) (Douglas, J.); *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (Stewart, J.); and *North Georgia Finishing, Inc. v. Di–Chem, Inc.*, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975) (White, J.). There are essentially three categories of state action cases, as follow:

(i) those cases in which state courts enforce an agreement affecting private parties;

(ii) those cases in which the state significantly involves itself with a private party; and

(iii) *those cases in which there is private performance of a governmental or sovereign function.*

*See e.g., Magill v. Avonworth Baseball Conference*, 516 F.2d 1328 (3d Cir.1975); *accord*

*Horton v. Flenory*, 889 F.2d 454, 458 (3rd Cir.1989). *See also Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 349–350, 352–353, 95 S.Ct. 449, 452–453, 454–455, 42 L.Ed.2d 477 (1975) (Rehnquist, J.) (emphasizing that "[w]hile the principle that private action is immune from the restrictions of the Fourteenth Amendment is well established and easily stated, the question whether particular conduct is 'private,' on the one hand, or 'state action,' on the other, frequently admits of no easy answer"; and explaining that state action is involved in cases consisting of "the exercise by a private entity of powers traditionally exclusively reserved to the State" or "traditionally associated with sovereignty"); HENRY J. FRIENDLY, THE DARTMOUTH COLLEGE CASE AND THE PUBLIC-PRIVATE PENUMBRA 18 (1968) (recognizing that unrestrained "private action," self-help repossession has resulted in general and serious denial of values Constitutional due process was meant to protect). History illuminates that a bank setoff is at bottom the private performance of a governmental (judicial) function.

5(b). It is especially important to an appropriate legal analysis that from its origination in ancient Rome (in the concept of *Compensatio*), to its introduction in England's chancery courts, to its emergence in early American (colonial) life as statutory, due process-laden, *court procedure:* setoff's pedigree reflects (as its obvious functional character itself evidences) the procedure's actual judicial and law-enforcement, state action nature. *See generally* Michael E. Tigar, Comment, *Automatic Extinction of Cross-demands:* Compensatio *From Rome to California*, 53 CALIF.L.REV. 224 (1965) (tracing the history

---

with respect to Perry Brothers, the July 31, 1989 Non–Readvancing Line of Credit Note itself provides that the bank might engage in certain acceleration and/or collection procedures under the Note *only if* such action was, in *good faith*, deemed necessary by the bank (to avoid loss). NCNB's Exhibit 1, the Non–Readvancing Line of Credit Note of July 31, 1989, provides in pertinent part:

or *any event occurs or condition exists which causes Bank to in good faith deem itself insecure or to in good faith believe the prospect of payment or performance by Maker or any other liable party under this note,* under any instrument or agreement executed in connection

with or as security for this note, or under any other indebtedness of Maker or any other liable party to Bank *is impaired; thereupon,* at the option of Bank, the principal balance and accrued interest of this note and any and all other indebtedness of Maker to Bank shall become and be due and payable forthwith without demand, notice of default, notice of acceleration, notice of intent to accelerate the maturity hereof, notice of non-payment, presentment, protest or notice of dishonor, all of which are hereby expressly waived by Maker and each other liable party.

(emphasis added)

of setoff to early Roman law) (hereinafter referenced as Tigar, Comment, *Automatic Extinction* ). See also *Bandy v. First State Bank, Overton, Texas*, 835 S.W.2d 609, 618 (Tex.1992) (citing Tigar, Comment, *Automatic Extinction*, and specifically recognizing that the doctrine of setoff as known in this country is rooted in early bankruptcy law in England, *as a matter of claims and counterclaims in lawsuits*, and that the early law of setoff in this country faithfully traced this lawsuit lineage); *Sullivan v. Merchants' Nat'l Bank*, 108 Conn. 497, 144 A. 34 (1928) (recognizing that the purpose of the setoff doctrine is to prevent "circuity of [judicial] actions"). In performing the self-help, involuntary summary civil dispute resolution procedure of setoff, banks do what the state civil judicial system would otherwise do; and what the state judicial systems historically *have* done. *Compare Connecticut v. Doehr*, 501 U.S. 1, 11–19, (forthcoming), 111 S.Ct. 2105, 2113–2116, 115 L.Ed.2d 1 (1991) (White, J.) ("Prejudgment attachment is a remedy unknown at common law. Instead, 'it traces its origin to the Custom of London, under which a creditor might attach money or goods of the defendant either in the plaintiff's own hands or in the custody of a third person, *by proceedings in the mayor's court or in the sheriff's court.'* Generally speaking, *attachment measures in both England and this country had several limitations that reduced the risk of erroneous deprivation which Connecticut permits.*") (quoting *Ownbey v. Morgan*, 256 U.S. 94, 104, 41 S.Ct. 433, 435, 65 L.Ed. 837 (1921); emphasis added here).

■ 5(c). The United States Supreme Court has tolerated some exceptions to the general rule of due process (which requires pre-deprivation notice and hearing)—but only in "extraordinary situations," where some valid, pressing interest is at stake that justifies postponing the notice and/or hearing until after the deprivation. Whether bank setoffs justify such an exception, and if so, what the contours of that exception should be, requires an examination of the competing interests at stake, along with the promptness and adequacy of any later safeguard proceedings afforded. The three-part inquiry set forth in *Mathews v. Eldridge*, 424 U.S. 319,

96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (Powell, J.), provides guidance in this regard. *Compare United States v. James Daniel Good Real Property*, —— U.S. ——, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) (Kennedy, J.) (applying the *Mathews* balancing test in order to determine what process is due relative to civil, ex parte, real property (drug) forfeiture proceedings—which test requires a three-prong balancing of the following considerations for due process inquiry: (i) the private interest affected by state action; (ii) the risk of erroneous deprivation of such interest through the procedures currently in use, and the probative value if any of additional procedural safeguards; and (iii) the state actor's interest, including the fiscal and administrative burdens that additional or substitute procedures would entail).

■ 5(d). The private interests at risk from a bank's performance of the self-help, involuntary summary civil dispute resolution procedure of setoff or asset seizure of a customer's deposits are significant indeed (as evidence by this very case), and these private interests accordingly weigh heavily in the *Mathews* balance. As this case illustrates, such setoffs can create an enormous risk of erroneous bank deprivation of private property. Essentially safeguardless, self-help, involuntary summary setoff "proceedings" such as those applied by NCNB in this case afford little to no protection to the innocent depositor whose accounts are improperly setoff. The availability of post-setoff notice and/or a post-setoff adjudicatory hearing is of no real recompense for losses caused by an erroneous setoff. Given the generally congested civil dockets in the courts (in the *federal* courts, at least), a depositor-claimant may not receive an adversary hearing until many months after the bank's setoff of his or her account. And even if the ultimate judicial decision is that the depositor-claimant was an innocent and that the bank lacked any good faith, probable cause to setoff the customer's account, this determination—coming months after the setoff—would wholly fail to effectively mitigate, let alone cure the "temporary deprivation" that an earlier notice (at least) (and/or a hearing) might. *Compare James Daniel Good Real Property, supra*, —— U.S.

at ——–——, 114 S.Ct. at 501–502 (citing and quoting *Connecticut v. Doehr, supra,* 501 U.S. at 11–18, 111 S.Ct. at 2113–2115).

■ 5(e). On the other hand, the bank's interest to be considered in this case is not the general one in conducting setoffs, but rather, the specific interest in conducting them with only post-setoff notice and a post-setoff hearing. The question presented is whether this particular, *post-setoff-notice-plus-post-setoff-hearing* interest of the bank's is justified by a pressing need for prompt bank setoff action. The answer is that this particular interest in not justified by such a pressing need. The bank's legitimate interests can be fully secured without such a dearth of due process.

■ 5(f). It does appear that while requiring *prior* notice of setoff and/or a pre-deprivation hearing might well largely eliminate powerful, negative (non-essential) setoff "externalities" suffered by debtors when banks perform setoffs—*e.g.,* bounced checks and cash flow squeezes threatening the livelihoods of merchants in particular—it would also drastically impair the essential effectiveness of generally legitimate banking setoffs. Depositors would seem bound to rush to withdraw their deposits after receiving notice; and setoff would at least cease to be an especially quick and effective remedy for banks. Banks would no longer be able to respond instantly to genuinely bad lending situations. Accordingly, courts have held that notice *prior to* setoff is not required under the law. *See generally Elizarraras v. Bank of El Paso,* 631 F.2d 366, 372 (5th Cir.1980) ("our research has revealed that the law in Texas and elsewhere is that notice is not required *prior to* setoff. . . .") (emphasis added). However, while requiring the bank to at least give contemporaneous notice to depositors of setoff actions against their deposits cannot eliminate the depositors' non-essential setoff injuries, such notice surely reduces the risk and degree of unnecessary injury that can otherwise accompany setoffs (especially wrongful setoffs)—without costing the bank much if anything in terms of "additional" time, money or effort. Put another way, contemporaneous notice of setoff: (i) requires minimal if any additional effort on the part of the bank, especially given the modern, rapid communication technology typifying today's world of finance (*e.g.,* automatic wire transfer and telecopier machines (not to mention the "simple" telephone)); (ii) produces no harm to the legitimate setoff interests and expectations of the bank; and (iii) serves a quite useful purpose in terms of bank depositors' fairness interests and reasonable expectations regarding their bank accounts. *See Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (Powell, J.). *See also Fuentes v. Shevin, supra,* 407 U.S. at 80–81, 92 S.Ct. at 1994–1995 ("The purposes of this requirement [the general rule of due process that pre-deprivation notice and a pre-deprivation hearing is required] is not only to ensure abstract fair play to the individual. Its purpose, more particularly, is to protect [one's] use and possession of property from arbitrary encroachment—to minimize substantively unfair or mistaken deprivations of property. . . .").

6(a). Justice Jackson's eloquent explanation of the significance of the *federal common law* in his *D'Oench, Duhme* concurring opinion applies to this case:

> Were [the federal courts] bereft of the common law, our Federal system would be impotent. This follows from the recognized futility of attempting all-complete statutory codes, and is apparent from the terms of the Constitution itself. * * * [R]ecognitions of [the federal courts'] common-law powers abound in the Constitution. * * * [Federal law] is found in the federal Constitution, statutes, or common law. Federal common law implements the federal Constitution and statutes, and is conditioned by them. Within these limits, federal courts are free to apply the traditional common-law technique of decision and to draw upon all the sources of the common law in cases such as the present.

*D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 469–472, 62 S.Ct. 676, 685–686, 86 L.Ed. 956 (1942) (Jackson, J., concurring) (citations omitted). As to this Court's conclusion that at least contemporaneous notice of setoff is compelled by the federal common law: the crucial national interest in standardized, fair

banking procedures is obvious. Indeed, it is reflected in such banking landmarks as the creation of the Federal Deposit Insurance Corporation, for example. Setoff is surely an extraordinarily fast and inexpensive means of bank debt collection. Its availability can provide a valuable alternative to traditional, more formal forms of security and civil dispute resolution. But setoff is just as surely an extremely powerful tool—and one capable of doing a great deal of harm to the nation's important commercial interests if left unchecked. *Compare United States v. James Daniel Good Real Property, supra,* —— U.S. at ——, 114 S.Ct. at 501 ("Although Congress designed the drug forfeiture statute to be a powerful instrument in enforcement of the drug laws, *it did not intend to deprive innocent owners of their property.*") (emphasis added here). Especially in the modern age of rapid, interstate (and international) finance and business, the national interest compels that bank setoffs be conducted according to basically fair as well as efficient standards.

6(b). The national needs compelling creation of the deposit insurance system in this country in turn compel at least a basically fair, federal common law notice requirement relative to the self-help, involuntary summary civil dispute resolution procedure of bank setoffs. In creating the deposit insurance system, the intent of Congress was to establish and maintain a system of banks in the United States where citizens may place their earnings with reasonable expectations of being able to get them out again upon demand—to insure, through the powers of the United States government, against a depositor at a federally insured bank losing any money from an insured account. While the Federal Deposit Insurance Corporation's statutory regime contemplates bank setoffs (*see e.g.,* 12 U.S.C. § 1813), the setoffs so contemplated must be limited to those to which a bank is actually entitled—and then only those rendered according to basically fair procedures. Anything less thwarts the very public policy and fundamental fairness concerns reflected in the deposit insurance system itself.

### 7. *Notice in This Case*

■ In this case, Perry Brothers has established by the preponderance of the evidence that on November 27, 1990—by "freezing" Perry Brothers' accounts—NCNB broke its promise to Perry Brothers that the bank would leave the company's accounts alone during the course of the parties' workout negotiations. Such was the beginning of the bank's setoff against Perry Brothers' accounts. Only on November 28, 1990 did NCNB generate a letter notifying Perry Brothers of the bank's *completion* of the setoff. Even assuming the truth of NCNB's notice contention—that the bank sent the notice *dated* November 28, 1990 *on* November 28, 1990 via telecopier—this telecopied communication nonetheless represents mere *post*-setoff notice. Indeed, the notice itself says as much (emphasis added): "NCNB Texas National Bank *has* set off the funds on deposit in the said accounts and *has* applied those funds in reduction of the amounts owed on the said Note." *Cf. e.g.,* Perry Brothers Exhibit 199, at 04.–05.013 (Special Asset Bank Credit Policy Manual, acknowledging that requisite good faith on the part of the bank necessitates written notice to borrowers *before* undertaking any "significant change in the status of a loan relationship," such as acceleration or foreclosure for example).

■ 8. As wrongful setoff of a depositor's account is a breach of a banking contract, it gives rise to the proximately-caused, contract-type damages already identified. *See e.g., Behring Int'l, Inc. v. Greater Houston Bank,* 662 S.W.2d 642 (Tex.App.—Houston [1st Dist.] 1983, writ dism'd). And it may also, as it has in this case, give rise to tort damages. *See Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 434 (Tex.1986); *Schindler v. Austwell Farmers Cooperative,* 829 S.W.2d 283, 288 (Tex.App.—Corpus Christi), *aff'd as modified,* 841 S.W.2d 853 (Tex.1992).

### G. *Conversion*

■ 1. Conversion is the unauthorized and unlawful exercise and assumption of dominion and control over the personal property of another which is inconsistent with, or to the exclusion of, the owner's

rights. One claiming conversion must prove that at the time of the claimed conversion, he or she:

(a) was indeed the owner of the property,

(b) had legal possession of it,

*or*

(c) was entitled to such possession.

*See e.g., Lone Star Beer, Inc. v. Republic Nat'l Bank of Dallas,* 508 S.W.2d 686, 687 (Tex.Civ.App.—Dallas [5th Dist.] 1974, no writ). While ordinarily it is true that the non-possessory plaintiff must establish that he or she demanded return of his or her property and that the defendant refused to return it, such demand and refusal are not necessary when the defendant-possessor's acts manifest a clear repudiation of the plaintiff's rights. *See e.g., Loomis v. Sharp,* 519 S.W.2d 955, 958 (Tex.Civ.App.—Texarkana [6th Dist.] 1975, writ dism'd). NCNB's wrongful setoff in this case amounted to an act manifesting the bank's clear repudiation of Perry Brothers' rights to the company's deposited money in the bank; this setoff action constitutes an act of conversion in this case. Perry Brothers has established by the preponderance of the evidence that NCNB converted approximately $1.3 million of Perry Brothers' property between November 27–29, 1990, when the bank exercised unauthorized dominion and control over "readily identifiable" Perry Brothers funds being transferred through the "ACH" wire transfer, cash collection system. *See generally e.g., Houston Nat'l Bank v. Biber,* 613 S.W.2d 771, 774 (Tex.Civ.App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.) (recognizing that an action will lie for conversion of money when its identification is possible and there is an obligation to deliver the specific money in question or otherwise particularly treat the specific money).

 2. As a tort, conversion allows damage awards for the value of injuries proximately caused by the defendant's act(s) of conversion. And, as the Fifth Circuit recently recognized: "the Texas courts have consistently found claims for both conversion and breach of contract based on a single set of facts and a single injury." *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Care Flight Air Ambulance Service, Inc.,* 18 F.3d 323, 327 (5th Cir.1994). *See also id.* at 326–328; *id.* at 327–328 ("The Texas courts have not held that in order to allege both a breach of contract and the tort of conversion, the conversion damages must be separate and distinct from the contract damages.").

### H. *Business Disparagement*

 1. By the preponderance of the evidence, Perry Brothers has also established its business disparagement claim against NCNB. The elements of this cause of action are:

(a) publication (by the defendant of the disparaging words);

(b) falsity;

(c) malice;

(d) lack of privilege (on the part of the defendant);

and

(e) special damages.

*See Hurlbut v. Gulf Atlantic Life Insurance Co.,* 749 S.W.2d 762 (Tex.1987).

 2. Whether a particular communication is disparaging or defamatory to another's interests must be determined by assessing the communication as a whole, in the context of the surrounding circumstances, to determine its overall effect.

3. It has been established that NCNB wrongfully returned unpaid approximately $130,000 in checks drawn by Perry Brothers to the order of several of its vendors and suppliers. These checks were wrongly, and wrongfully, stamped: "Funds Not Available." The Court has also been presented with evidence of the bank's "refusal to provide" information to third parties about the specifics of Perry Brothers' credit standing, contrary to what the bank would freely have done under normal circumstances; and of other disparaging communications by the bank about the company's credit strength.

4. Under the facts and circumstances shown to exist in this case, the bank's "silence" effectively spoke volumes about Perry Brothers' financial condition to those with whom the company did or desired to do business. NCNB's "refusal to provide" credit information in response to inquiries from

interested third parties spoke out in stark and negative contrast to the bank's previous practice of full, faithful, positive cooperation with those with whom Perry Brothers did or sought to do business who would inquire of the bank as to Perry Brothers' financial situation; and this clearly communicated disparaging information about the company.

5. Finally, as this Court recognized early on, in its *Memorandum Opinion and Order* denying the bank's motion for summary judgment, the very communication that the Note was being handled by the Special Asset Bank—*i.e.,* the special division of NCNB for "bad risks"—might constitute a disparaging communication about Perry Brothers. It has been established by the preponderance of the evidence in this case that the bank's "put" of the Note into the Special Asset Bank did constitute such a disparaging communication. In this regard, the Court credits, *inter alia,* the testimony of Perry Brothers' Chairman Ray Baldwin, Perry Brothers' President and Chief Operating Officer Jack Simpson, and Arthur Temple of the T.L.L. Temple Foundation—each of whom attested to the fact that the "put" of the Perry Brothers Note into the Special Asset Bank actually and significantly disparaged Perry Brothers' good business name; and the Court credits the statement of Stanley Knitting Mills, Inc.—to the effect that one of the reasons it withdrew its credit from Perry Brothers was because Perry Brothers' loan was in the "high risk" section of NCNB.

6. Perry Brothers has also established that the bank's disparagements of the company were taken with "malice." The malice element of this cause of action can be found if the actor is reasonably deemed to have acted unlawfully, intentionally and knowingly to disparage another without just cause or excuse. *See e.g., Barker v. Brown,* 772 S.W.2d 507, 511 (Tex.App.—Beaumont 1989, no writ). Perry Brothers has established that NCNB was such an actor.

7. Likewise, NCNB is not entitled to a qualified privilege" for its disparaging communications about Perry Brothers to third parties. The "qualified privilege" of legal justification or excuse is an affirmative defense upon which the defendant (here, NCNB) bears the burden of proof. *See Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 689–691 (Tex.1989). The question of the bank's good faith or lack thereof has been a critical issue in this case relative to the many different causes of action arising from the bank's sweeping wrongful actions against Perry Brothers (i.e., intertwined with such issues as the propriety of the bank's downgrading of the company's credit rating, the bank's promises not to setoff the company's accounts, and the bank's motivations for exercising the setoff against Perry Brothers' accounts when it did). And with respect to each of these causes of action, the Court has held against the bank regarding the question of the bank's good faith or lack thereof. Therefore, the Court finds and holds that NCNB also lacked in particular its claimed qualified, good faith, privilege to render the business disparaging communications it did about Perry Brothers.

8. A business disparagement cause of action may give rise to an actual damages award for harm to the victim's reputation. Such an action justifies damages for any pecuniary harm to the business in question which flows from the defendant's disparagement. *See Frank B. Hall & Co. v. Buck,* 678 S.W.2d 612, 626–627 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.), *cert. denied,* 472 U.S. 1009, 105 S.Ct. 2704, 86 L.Ed.2d 720 (1985); *Golden Bear Distributing Systems of Texas, Inc. v. Chase Revel, Inc.,* 708 F.2d 944 (5th Cir.1983). NCNB's assertions notwithstanding, loss of credit damages suffered by vice of NCNB's disparaging conduct against Perry Brothers' business do not require exact precision. It would be impossible to establish with precision an exact amount of credit damages suffered by Perry Brothers because of the obviously credit-damaging disparagement of the company by the bank—and thus the "failure" of Perry Brothers to do so is no basis for denying the company recovery for the reasonably ascertainable amount of such damages clearly incurred. *See e.g., Commonwealth Lloyd's Ins. Co. v. Thomas,* 825 S.W.2d 135, 146–147 (Tex.App.—Dallas 1992), *writ granted, set aside, dism'd per*

*parties' settlement,* 843 S.W.2d 486 (Tex. 1993) (awarding $100,000.00 damages based upon plaintiff husband and wife business owners' testimony that their building and real estate brokerage business depended upon their ability to borrow money and that the defendant's wrongful conduct prevented them from so borrowing). Perry Brothers has succeeded in establishing by the preponderance of the evidence that it suffered multi-million dollar damages by vice of the bank's far-ranging actions against, including its disparagement of, the company—*inter alia,* in terms of the company's loss of credit standing, and other damages to Perry Brothers' earning capacity and capacity to compete proximately resulting from the bank's disparagement of the company.

## I. *NCNB and FDIC Assertions in Particular*

NCNB and the FDIC have raised several defensive contentions, the most colorable of which are discussed next.[9]

### 1. *D'Oench, Duhme*

 1(a). NCNB has argued that Perry Brothers' claims are barred by the FDIC-protective *"D'Oench, Duhme* doctrine" derived from the Supreme Court's decision in

*D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942) (Douglas, J.), and by the statutory complement to that rule of caselaw at 12 U.S.C. § 1823(e). But *"D'Oench, Duhme "* does not protect the FDIC or its assignees from the consequences of their own conduct. *See e.g., FDIC v. Harrison,* 735 F.2d 408, 411–413 (11th Cir. 1984); *Sibarium v. NCNB Texas Nat'l Bank,* 107 B.R. 108, 112–113 (Bankr. N.D.Tex.1989). *Compare e.g., FDIC v. Bryne,* 736 F.Supp. 727, 731–733 (N.D.Tex. 1990).

 1(b). The *D'Oench, Duhme* doctrine and its United States Code basic codification serve to estop a maker of a promissory note from asserting, as a claim or defense, that the FDIC in taking over a failed bank cannot collect upon the note because the maker and the failed bank secretly agreed to alter or vary the terms of the note as written.[10] The general purpose of *D'Oench, Duhme* is to further the policy of promoting the stability of the nation's banking system— by enabling the FDIC to quickly but accurately value the assets of a failed bank on the basis of the books and records available, and prevent obligors from systematically thwarting FDIC purposes through assertions

9. In NationsBank's Motion for New Trial, Restated and Supplemental Motion for Amended and Additional Findings of Fact, and Brief in Support Thereof (filed April 11, 1994), at p. 37, the bank asserts that the Court has erred in not providing a written analysis of several additional defenses raised by NCNB against Perry Brothers—theories of the company's: (1) ratification; (2) waiver; (3) "unclean hands;" and (4) failure to mitigate damages. However, the Court determined that the slavish, essentially scrivener's treatment of these defenses called for by the bank in its post-*Final Judgment* motion was not (and is not) warranted, as the Court determined that these defenses were wholly unproved by and unavailing to the bank, as fully illuminated by the findings of fact, and analyses and conclusions of law already rendered in writing by the Court in its *Final* (and now, its *Superseding, Amended* ) *Memorandum Opinion and Order.*

10. Section 1823(e) of title 12 of the United States Code provides:

No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or Section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured

depository institution, shall be valid against the [FDIC] unless such agreement:
 (1) is in writing,
 (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
 (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
 (4) has been, continuously, from the time of its execution, an official record of the depository institution.
12 U.S.C. § 1823(e). While there are some distinctions between the common law *D'Oench, Duhme* doctrine and the statutory complement of this judicial doctrine—*see e.g., FDIC v. McClanahan,* 795 F.2d 512, 514 (5th Cir.1986); *Agri Export Co-Op v. Universal Savings Ass'n,* 767 F.Supp. 824, 834 (S.D.Tex.1991)—for purposes of the issues raised in this case, the common law doctrine and Section 1823 are equally applicable. They are thus referenced here in tandem, as a collective principle, as section 1823(e), the *D'Oench, Duhme* doctrine, or simply *D'Oench, Duhme.*

against the FDIC of unwritten understandings that vary the terms of a failed bank's loan assets. *See North Arkansas Medical Center v. Barrett,* 962 F.2d 780, 788–789 (8th Cir.1992) ("the purposes of section 1823(e) are to facilitate regulation and protect [federal receivers] from financial loss by assuring that the bank's financial condition can be assessed instantaneously; to assure that senior bank officials are aware of unusual transactions before the bank agrees to them; and to prevent collusion between bank employees and customers on the eve of a bank's failure."); *see also FDIC v. Harrison, supra,* 735 F.2d at 411–412 ("FDIC was created as part of the Federal Deposit Insurance Corporation Act as an instrument for insuring to a limited extent the deposits of the banks participating in the plan. The purpose of the Corporation is to promote the stability of the banking system by preventing runs on banks by depositors and keeping open the channels of trade and commercial exchange.") (citing *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942) (Douglas, J.)).

1(c). Essentially, according to NCNB: Perry Brothers is seeking recovery largely for the actions and alleged misconduct of the failed First RepublicBank–Lufkin; the policies of *D'Oench, Duhme* have been extended to protect the FDIC from liability for all misconduct on the part of the banks it takes over; *and* such protection should also be extended to NCNB in its role as a "bridge bank" and purchaser of certain First RepublicBank–Lufkin assets and liabilities (including the Note in issue). The bank's argument fails to stand up: this case is not simply about unrecorded side agreements between the obligor of a note and a *failed* bank, in which the misconduct simply involves the failure by a failed bank to adhere to the promises made under an oral side agreement.

1(d). In this case, neither the FDIC nor NCNB seeks to collect on an asset received from First RepublicBank or any other failed bank. Rather, the Note on which the FDIC (the current holder of the Note) bases its claim was made by NCNB after NCNB took over First RepublicBank–Lufkin and was

paid down to "zero" balance in December, 1988. Perry Brothers has not asserted any claims against NCNB or the FDIC for alleged wrongful conduct of a failed bank. The wrongful conduct at issue was proved to have been committed *by NCNB.* As has already been discussed, the renewal of Perry Brothers' line of credit was made by NCNB, and NCNB made the critical, deceptive promises upon which Perry Brothers reasonably, detrimentally relied. Perry Brothers has established that, while negotiations between NCNB and Perry Brothers which led to the 1988 agreements *began* in the Spring, 1988, these negotiations continued past July 29, 1988, and did not result in executed agreements until August 24, 1988 (with the effective date of renewal being October 29, 1988).

### 2. *The Statute of Frauds*

2(a). Contrary to NCNB's further contentions, regarding the statute of frauds: because the contract to renew was *capable* of being performed before a year's expiration, it cannot be deemed violative of the statute of frauds. *See e.g., Republic Bankers Life Ins. Co. v. Wood,* 792 S.W.2d 768, 776 (Tex.App.— Fort Worth 1990, writ denied); *International Piping Systems, Ltd. v. M.M. White & Assoc., Inc.,* 831 S.W.2d 444 (Tex.App.— Houston [14th Dist.] 1992, writ denied).

2(b). Perry Brothers has established by the preponderance of the evidence that it reached an agreement with NCNB under which the bank agreed to renew Perry Brothers' line of credit in accordance with the historical practices of Perry Brothers and NCNB's predecessor—*i.e.,* on the same basic terms as the 1988 agreement, *unless* Perry Brothers suffered a major deterioration of its financial condition. This possibility of the contract expiring within one year causes the agreement to fall without the statute of frauds.

2(c). Moreover, Perry Brothers established by the preponderance of the evidence that NCNB promised to renew Perry Brothers' line of credit on reasonable terms when the Note matured on July 29, 1989— and that Perry Brothers reasonably and justifiably relied on this promise, and thereby suffered injury when the bank broke the promise. This is itself sufficient to remove

Perry Brothers' essential breach of contract claim from the statute of frauds—even *if* the Court deemed the larger contract asserted by Perry Brothers to be unenforceable; as this promise to renew in 1989 on reasonable terms could have taken place within a year.

### 3. *The Parol Evidence Rule and the Merger Clause Doctrine*

3(a). NCNB has also claimed that the parol evidence rule and the merger clause doctrine bar Perry Brothers' contract claims against the bank. NCNB is wrong.

3(b). The parol evidence rule is a rule of substantive contract law. But it does not apply to the agreements NCNB made with Perry Brothers. Under Texas law, it is well established that the parol evidence rule generally bars enforcement of prior or contemporaneous agreements to vary, add to, or contradict terms of a fully integrated written instrument. *Beijing Metals & Minerals Import/Export Corp. v. American Business Center, Inc.*, 993 F.2d 1178, 1182–1183 (5th Cir.1993). *Cf. generally Quitta v. Fossati*, 808 S.W.2d 636 (Tex.App.—Corpus Christi 1991, writ denied) (parol evidence rule does not apply to agreements made after the written agreement, nor does it prevent a written agreement from being later modified by the parties through an oral agreement). While a written instrument does presume that all prior agreements between the parties relating to the transaction have been merged into the written instrument, a party may rebut this presumption. *See e.g., Jack H. Brown & Co. v. Toys "R" Us, Inc.*, 906 F.2d 169, 173–176 (5th Cir. 1990). In this case, the 1988 loan agreement itself provided that the bank *might* agree to renew and extend the line of credit. Perry Brothers' proof that NCNB did indeed agree to do just that cannot be excluded under the parol evidence rule.

3(c). Further, neither the 1988 nor the 1989 loan agreement contains an express "merger clause"—dictating that the document contains the only agreements between the parties concerning their business dealings, and that prior agreements are superseded by the written document. Accordingly, even *if* the Court deemed the bank's oral agreement with Perry Brothers to be a *modification* of the parties' loan agreement, such would be permissible. Under Texas law: absent an express merger clause, a written contract may be so modified by an oral agreement (at least as long as the contract, like the one in this case, is not required by the statute of frauds to be in writing).

### J. *Prejudgment Interest Contest*

1. Perry Brothers has argued that the FDIC is entitled to recover prejudgment interest on the Note only at the simple interest rate of 10% per annum, compounded daily from the date such damages were incurred (stipulated by the parties to be November 29, 1990). (State law governs the award of prejudgment interest. *See Bartholomew v. CNG Producing Co.*, 832 F.2d 326, 330–331 (5th Cir.1987). And Texas law sets the minimum judgment rate of interest at 10%. Tex.Rev.Civ.Stat.Ann. art. 5069–1.05 § 2.) The Court disagrees with Perry Brothers in this regard. The FDIC was neither an accomplice to nor compliant in NCNB's wrongdoings against Perry Brothers. The FDIC is thus entitled to recover a default rate of prejudgment interest (of 17%) on the Note, accruing from and after November 29, 1990.

2. However, the *default-rate-of-prejudgment - interest - versus - the - simple - rate - of - prejudgment - interest* differential that Perry Brothers owes the FDIC represents an actual damage to Perry Brothers proximately and foreseeably caused by NCNB—a liability the company has incurred by vice of the bank's wrongful conduct toward Perry Brothers. Hence, NCNB owes Perry Brothers, for the company's payment to the FDIC, this excess, default-rate-of-prejudgment-interest differential the company owes the FDIC—as part of Perry Brothers' actual damages recoverable against NCNB.

### K. *Attorneys' Fees and Costs*

1. As the FDIC was not primarily implicated in the bank's wrongdoings against Perry Brothers, the FDIC is entitled to recover its reasonable attorneys fees and costs incurred in collecting on the Note—which the parties have stipulated on the record during

case proceedings to be in the amount of $250,000.00.

■ 2. However, the Note-collection attorneys' fees and costs the FDIC is entitled to recover from Perry Brothers are actual damages borne by Perry Brothers—proximately and foreseeably caused by NCNB— and NCNB thus owes Perry Brothers this amount for the company's payment to the FDIC, as part of Perry Brothers' total actual damages recoverable against NCNB.

■ 3. Perry Brothers is further entitled to recover from NCNB the reasonable costs and attorneys' fees the company has personally incurred in this litigation. Such amounts paid by Perry Brothers constitute additional actual damages the company has borne which were proximately and foreseeably caused by NCNB's wrongful conduct toward Perry Brothers.

## III.

### Conclusion and Order

In accordance with the *Superseding Amended Final Judgment* entered contemporaneously with this *Superseding Amended Final Memorandum Opinion and Order,* and for the foregoing reasons, it is hereby **Ordered, Adjudged and Decreed** that the above findings of fact and conclusions of law, and the following orders shall be entered.

### A. *Perry Brothers' Entitlements*

1. It is hereby **Ordered, Adjudged and Decreed** that Perry Brothers, Inc.'s (hereinafter referenced as Perry Brothers) is entitled to recover from NCNB (now Nations-Bank) the actual damages amount of $6 million—which represents Perry Brothers' actual damages *not including* the company's also-recoverable damages of the default-prejudgment-interest-rate differential Perry Brothers has been left owing the FDIC due to the illegal actions of NCNB; the FDIC's default collection fees and costs, which Perry Brothers has been left owing the FDIC due

to the illegal actions of NCNB; and the company's own attorneys' fees and costs incurred in this litigation (all of which are further recoverable damages to Perry Brothers—and which were the subject of a hearing, calculation and resultant Report and Recommendation conducted and rendered by United States Magistrate Judge Harry W. McKee pursuant to this Court's *Order* of December 17, 1993; which Report and Recommendation this Court has adopted by earlier *Order* ).

2. Specifically, it is hereby **Ordered, Adjudged and Decreed** that, in addition to the above-referenced actual damages, and in accordance with this Court's adoption of the March 7, 1994 Report and Recommendation of the United States Magistrate Judge, Perry Brothers is entitled to recover from NCNB the following reasonable, actual damages amounts:

(a) Perry Brothers' personally-incurred attorneys' fees and other litigations costs, in the amount of $361,613.00;

(b) Perry Brothers' personally-incurred consulting and accounting costs, in the sum of $157,723.00;

(c) Perry Brothers' miscellaneous cost personally-incurred in the above styled cause of action, in the sum of $35,504.28;

(d) the default-prejudgment-interest-rate differential Perry Brothers has been left owing the FDIC by vice of NCNB's actions against Perry Brothers, in the amount of $406,613.45;

and

(e) the FDIC's attorneys' fees and costs that Perry Brothers has been left owing the FDIC by vice of NCNB's actions against Perry Brothers—stipulated on the record to be in amount of $250,000.00.

3. It is hereby **Ordered, Adjudged and Decreed** that Perry Brothers is entitled to post-judgment interest on its total above-referenced, actual damages awarded herein—at the current rate of 5.28%.[11]

---

**11.** This *currently-applicable,* post-judgment interest rate has been substituted for the rate listed (as the then-current rate) in the Court's earlier *Memorandum Opinions and Orders.* Today's since-changed rate is the controlling rate relative

to the *Superseding Amended Final Judgment* in this case, filed contemporaneously with this *Superseding, Amended Final Memorandum Opinion and Order.*

### B. *The FDIC's Entitlements*

1. It is hereby **Ordered, Adjudged and Decreed** that the FDIC is entitled to recover from Perry Brothers the principal sum still owing on the Note in issue—$1,215,644.12—as well as the applicable (17%) default, pre-judgment interest rate accrued on this principal amount from and after November 29, 1990.

2. It is hereby **Ordered, Adjudged and Decreed** that the FDIC is entitled to recover from Perry Brothers the former's reasonable attorneys' fees and costs associated with the collection from Perry Brothers on this Note—which is $250,000.00 in accordance with the stipulation of the parties on the record at trial in this matter.

3. It is hereby **Ordered, Adjudged and Decreed** that post-judgment interest on the amount the FDIC is entitled to recover from Perry Brothers (to wit, the $1,215,664.12 principal plus the 17% default-rate pre-judgment interest due relative to this principal, plus the FDIC's Note-collection attorneys' fees and costs stipulated on the record to be $250,000.00) shall be awarded to the FDIC at the rate of 5.28% (the currently applicable post-judgment interest rate).

**So Ordered.**