In the Matter of ENJET, INC., Debtor.

ENJET, INC., Plaintiff,

v.

STAPP TOWING CO., INC., Defendant.

Bankruptcy No. 95–10015.
Adversary No. 95–1013.

United States Bankruptcy Court,
E.D. Louisiana.

March 5, 1997.

---

John M. Duck, Paul Pastorek, Kenneth F. Tamplain, Adams & Reese, New Orleans, LA, for Debtor.

David A. Bowers, Lundy & David, Jackson, MS, for Stapp Towing, Inc.

Alan H. Goodman, James C. Butler, Lemle & Kelleher, New Orleans, LA, for Banque Paribas.

Elizabeth J. Futrell, Jones, Walker, Waechter, Poitevent, Carriere & Denegre, New Orleans, LA, for Bank of America.

Philip K. Jones, Jr., Liskow & Lewis, New Orleans, LA, Deidre B. Ruckman, David R. Snodgrass, Gardere & Wynne, L.L.P., Dallas, TX, for Unsecured Creditors' Committee.

Diana L. Rachal, Staff Attorney, Office of the U.S. Trustee.

## MEMORANDUM OPINION

JERRY A. BROWN, Bankruptcy Judge.

This matter came on for trial on August 15, 1996 on the amended complaint of the debtor in possession, Enjet, Inc. ("Enjet") seeking damages from Stapp Towing Co., Inc. ("Stapp") allegedly suffered by Enjet as a result of Stapp's wrongful retention of Enjet's property. The court has considered the evidence, the memoranda, and arguments of counsel, and makes the following determinations.[1]

### I. FINDINGS OF FACT

1. Enjet filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on January 3, 1995. The order confirming Enjet's first amended plan of reorganization (the "Plan") was entered on November 7, 1995.

2. Enjet is engaged in the business of trading, blending and/or refining different types of oil into various petroleum products.

---

1. This memorandum opinion constitutes the court's findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052. The parties stipulated in the pretrial order that the court has jurisdiction over the matter under 28 U.S.C. § 1334(b), and that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(E) and (O). (Pl. 34 at 2).

(Pl. 34, Pretrial Order, Uncontested Material Fact # 4)

3. Stapp is a corporation organized under the laws of the State of Texas and is engaged in providing marine transportation services primarily with towing vessels and barges. (Pl. 34, Uncontested Material Fact # 5).

4. Prior to the bankruptcy filing, Enjet purchased 47,784.24 barrels of oil (the "Product") from a third party. (Pl. 34, Uncontested Material Fact # 6).

5. Prior to the bankruptcy filing, Enjet contracted with Stapp for the transport and delivery of the Product to Galveston Terminals, Inc. ("GTI") in Galveston, Texas. (Pl. 34, Uncontested Material Fact # 7).

6. The Product was subsequently loaded, prepetition, at a location on the Mississippi River in or near Geismar, Louisiana on Stapp's Barges A–29 and DB–32. (Pl. 34, Uncontested Material Fact # 7).

7. According to Stapp Invoice No. 4602 and No. 4603, the charge for towing Barges A–29 and DB–32 containing the Product from Geismar, Louisiana to Galveston, Texas was $41,872.28. (Pl. 34, Uncontested Material Fact # 8).

8. When the barges arrived in Galveston, Texas on January 6, 1995, after the bankruptcy filing, Stapp refused to discharge the Product until Enjet paid all outstanding invoices for services rendered. Those invoices include invoices Nos. 4602 and 4603 and others for prepetition services, which total indebtedness was $208,962.23. (Pl. 34, Uncontested Material Fact # 10).

9. On January 6, 1995, Enjet tendered to Stapp a check in the amount of $41,872.28 for payment of the two invoices. (Pl. 34, Uncontested Material Fact # 9).

10. Stapp did not accept the tendered check, and informed Enjet that it had administratively frozen the Product so that it could exercise an administrative setoff to Stapp's claim against Enjet. Stapp retained possession of the Product.

11. On January 12, 1995, Stapp notified Enjet that it was willing to accept Enjet's $41,872.28 check, continue to hold $166,979.75 worth of Enjet's fuel (10,365.19 barrels), and deliver the remaining fuel (37,419.05 barrels) to Enjet. Stapp also imposed the condition that Enjet would have to agree not to interfere, or cause any interference with, Stapp's barges. Stapp notified Enjet that it intended to file a motion to lift the automatic stay so that it could administratively setoff the fuel that was subject to its administrative freeze against the debt that Enjet owed Stapp. Enjet refused Stapp's offer.

12. Bruce Stapp, Chief Executive Officer for Stapp, testified that he also offered to return 37,419.05 barrels, and to sell to Enjet the remaining $166,979.75 worth of fuel that Stapp was holding.[2]

13. Stapp filed its Motion for Relief from the Automatic Stay and Abandonment, or Alternatively, for Adequate Protection ("motion for relief from automatic stay") (Jt.Ex. 18) on January 17, 1995 seeking authority to proceed with an administrative setoff or, alternatively, for an order conditioning the delivery of the Enjet fuel on some form of adequate protection.

14. Enjet filed the pending adversary proceeding against Stapp seeking turnover of the Product on January 17, 1995.

15. After negotiation and receiving acknowledgment and confirmation from Enjet that it would not interfere or cause any interference with Stapp's barges, on or about January 20, 1995, Stapp agreed to and did in fact discharge approximately 37,419.05 barrels of the Product into the possession of Enjet. However, Stapp maintained possession of approximately 10,365.19 barrels of the Product worth approximately $208,962.23 to protect the right to set off that it had asserted in its motion for relief from automatic stay. (Jt.Ex. 18). (Pl. 34, Uncontested Material Fact # 11).

16. The court denied Stapp's motion for relief from automatic stay at a hearing on February 22, 1995. (Jt.Ex. 19). Immediate-

---

**2.** The court places little weight on this testimony because Stapp did not own the fuel it was offer- ing to sell back to Enjet. It was owned by Enjet.

ly thereafter, Stapp delivered the remaining 10,365.19 barrels of Product to Enjet. (Pl. 34, Uncontested Material Fact # 11).

17. Enjet had originally purchased the Product to fulfill a spot contract (the "spot contract") it had with Shell International Trading Company ("SITCO"). (Ex. 1). The spot contract provided that Enjet·was to sell three types of oil to SITCO, including 100,000 barrels of gasoil, and was to deliver the product between January 20 and 22, 1995. (*Id.* at 2). The ultimate destination of the oil sold to SITCO under the spot contract was Guatemala.

18. Enjet intended to supply the oil sold to SITCO under the spot contract in Galveston. The M/V PORT AU PRINCE was to transport the oil. Enjet had no direct contact with the shipowner, and no control over what the shipowner would charge for transporting the fuel.

19. John Kennelly ("Kennelly"), operations manager for Enjet, testified that it caused great concern when Stapp refused to discharge the Product because the type of oil on Stapp's barges was hard to acquire.

20. Tim Mercier ("Mercier"), executive vice president for Enjet, is a trader who buys and sells oil products for Enjet. He testified that the gasoil required by the spot contract is used in the export market and is not found commercially in the United States. The gasoil is unique in that it has a higher cetane level, is a lighter color, and has a much higher flashpoint than is normally commercially available. To fulfill the spot contract, Enjet had to blend several different types of petroleum products, similar to using a recipe, in order to get the right mix. Enjet's Tank T–100–3 in Galveston was to be the primary receiver for all the components to make the right blend called for by the spot contract.

21. Mercier testified that when Stapp refused to deliver the Product, it caused great concern because there was no other material that Enjet could find commercially in the immediate area of Galveston that could satis-

fy the spot contract. He stated that Enjet had purchased the Product that was aboard the Stapp barges specifically in order to fulfill the spot contract with SITCO. After Stapp refused to deliver the barges, he personally contacted three companies, and other Enjet personnel contacted others, but no one could find fuel with a flashpoint that would be high enough to make an appropriate mix to fulfill the spot contract. Mercier further testified that Enjet needed all of the fuel aboard the Stapp barges to complete its mix. A release of only part of the fuel would not allow Enjet to fulfill the spot contract.

22. Mercier stated that in the absence of the Product aboard the Stapp barges, Enjet had to scramble to find a substitute material of a lesser quality, but that would still meet the SITCO requirements. As an alternative to using the Product, Enjet purchased approximately 70,000 barrels of fuel from the refinery in St. Rose, Louisiana to make a blend with approximately 30,000 barrels of fuel that Enjet had in Galveston.[3]

23. Mercier and Kennelly testified that in considering how to fulfill the spot contract without the Stapp Product, and using the 70,000 barrels of fuel from St. Rose, Enjet considered whether it would be better to divert the M/V PORT AU PRINCE or hire barges to move the fuel to Galveston. SITCO had advised Enjet that their estimate of the cost of rerouting the M/V PORT AU PRINCE was $45,000 to $55,000.

24. Kennelly testified that transporting the fuel by barge would require the M/V PORT AU PRINCE to be at anchor for approximately four days, with ship demurrage running at $15,000 per day, or a total of approximately $60,000, or $80,000 if it took an extra day.[4] In addition, the estimated charges for the barges was approximately $30,000. Thus, the total amount for using the barges would be at least $90,000, if all went well.

25. Mercier testified consistently with Kennelly that in analyzing what to do Enjet considered that the cost of moving the fuel

---

3. The spot contract was ultimately amended because Enjet could not comply with the original terms due to unavailability of the Product. (*See* amendment to Ex. 1).

4. Paragraph 12 of the spot contract provided for a demurrage rate of $14,000 per day. (Ex. 1).

by barge was equal to or greater than having the vessel load at two ports. In addition, if Enjet had to purchase other product and move it by barge, the company would be in further financial trouble. At that time, shortly after the bankruptcy filing, Enjet was in a cash crunch and did not have the financial wherewithal to charter more barges to move fuel.[5] Enjet was hoping for a resolution of the matter with Stapp, but when a final decision had to be made around January 12, 1995, Enjet decided to divert the M/V PORT AU PRINCE.

26. Kennelly testified that Enjet and SITCO agreed to divert the M/V PORT AU PRINCE on January 16, 1995. The confirming written notice was sent on January 17, 1995.

27. The M/V PORT AU PRINCE arrived at the diverted location—the IMTT Terminal in St. Rose, Louisiana on or about January 19, 1995, and departed on or about January 22, 1995. The vessel arrived in Galveston on or about January 23, 1995, and departed on or about January 24, 1995.

28. The court finds the testimony of Kennelly and Mercier to be credible.

29. The actual charges for diverting the M/V PORT AU PRINCE were $66,747.52. (Exs. 8 and 9). Kennelly testified that the costs for diverting the vessel are costs of the shipowner that are negotiated between the charterer and the shipowner. Enjet had no say in the amount of these costs. This amount was deducted from the invoice Enjet sent to SITCO for payment under the spot contract. (Ex. 9).

30. Because of the diversion, Enjet also incurred inspection charges for loading the M/V PORT AU PRINCE in St. Rose in the amount of $3,043.00. (Ex. 10).

31. Enjet also incurred charges of $801.50 for inspection and analysis of the Product because Stapp broke up the Product into two deliveries. (Ex. 12).

32. Beginning on January 24, 1995, and for all times thereafter, Enjet paid the Bank of America interest at an annual rate of 9.5% on all borrowed funds.

33. Enjet filed its first amended complaint on February 22, 1996. (Pl. 16). The first amended complaint seeks damages resulting from Stapp's intentional violation of the automatic stay and wrongful detention or conversion of the Product in the amount of $74,587.31 and/or such other amounts proved at trial, plus legal interest and reasonable attorney's fees and costs resulting from the failure of Stapp to deliver timely the oil.

## II. *CONCLUSIONS OF LAW*

### A. *Core/Non-core*

■ Stapp argues that Enjet's claims of breach of contract and conversion raise non-core causes of action on which this court cannot render a final judgment without the consent of the parties. Stapp contends that it has never expressly or impliedly given such consent.

The analysis of the court's jurisdiction to determine this case starts with 28 U.S.C. § 1334 which provides in pertinent part that:

"... the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."

28 U.S.C. § 1334(b).

Although the district court is authorized to exercise jurisdiction in this case, the authority to determine contested issues has been delegated to this court pursuant to 28 U.S.C. § 157(a) which provides:

Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.

28 U.S.C. § 157(a). In accordance with 28 U.S.C. § 157(a), the United States District Court for the Eastern District of Louisiana has referred to the bankruptcy judges of this district all cases under title 11 and all proceedings arising under title 11 or arising in

---

**5.** If the vessel were diverted, the charges could be offset with SITCO and would therefore not require an immediate outlay of cash.

or related to a case under title 11. *Order of Reference of Bankruptcy Cases and Proceedings* (E.D.La. Mar. 30, 1990).

Subsection 157(b)(1) of Title 28 vests full judicial power in bankruptcy courts over "core proceedings arising under title 11, or arising in a case under title 11". 28 U.S.C. § 157(b)(1). A non-exclusive list of core proceedings is set forth at 28 U.S.C. § 157(b)(2), and includes the following:

> other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims.

28 U.S.C. § 157(b)(2)(O).

The Fifth Circuit has further defined the types of proceedings that are included within core proceedings, as follows:

> [A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case.

*In re Wood*, 825 F.2d 90, 97 (5th Cir.1987).

■ Applying these precepts to the case at bar results in the conclusion that the debtor's claims are core proceedings. Enjet and Stapp entered into the spot contract wherein Stapp agreed to transport and deliver the Product to GTI before Enjet filed for bankruptcy. After the bankruptcy filing, on January 6, 1995, Stapp refused to discharge the Product until Enjet paid all outstanding invoices for services rendered, including $167,089.95 in invoices for previously rendered services. Although Enjet tendered $41,872.28 to Stapp for payment of the two invoices for delivery of the Product, Stapp continued to refuse to discharge the Product. At the moment Stapp refused to discharge the Product, Stapp violated the automatic stay imposed by 11 U.S.C. § 362. But for the automatic stay, Stapp would conceivably have had warehouse liens, rights of reclamation, and/or other liens that entitled Stapp to keep the product until payment on all invoices was received. In other words, if Enjet had not been a debtor in possession, there would have been no right to demand the Product without payment of the prepetition

debt. Therefore, the debtor's claim comes within the definition of a core proceeding set forth in *Wood* because it invoked a substantive right provided by title 11 that could arise only in the context of a bankruptcy case. It further comes within Section 157(b)(2)(O) in that it will result in the adjustment of the debtor-creditor relationship. *See also In re Pester Refining Co.*, 66 B.R. 801, 817 (Bankr. S.D.Iowa 1986) (conversion claim brought against a prepetition creditor who converted property of the estate post-petition was core proceeding).

Accordingly, the court finds that the debtor's claims are core proceedings and that this court may enter a final judgment on the claims in accordance with 28 U.S.C. § 157(b)(1).

Because the court finds that the debtor's claims are core, it need not address the debtor's alternative argument that Stapp's failure to timely object to the court's jurisdiction combined with its answer to the first amended complaint admitting that the case is a core proceeding impliedly consented to the jurisdiction of the bankruptcy court to render a final decision.

### B. *Turnover*

The debtor's original request made in the complaint for turnover of the Product is moot because Stapp ultimately turned over the Product to the debtor on January 20, 1995 and February 2, 1995.

### C. *Breach of Contract Claim*

#### 1. *Enjet's entitlement to assert the claim*

■ Stapp argues that the debtor's claim for breach of contract is a new issue which was never raised in the debtor's complaint or amended complaint, and that the debtor is attempting to "backdoor" its way into a damage award.

This argument is without merit. The pretrial order, filed on August 9, 1996 and signed by the attorneys for both parties, includes whether Stapp breached its contract with Enjet as a contested material fact and as an issue of law. It is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs

the issues and evidence to be presented at trial. *Branch–Hines v. Hebert,* 939 F.2d 1311, 1319 (5th Cir.1991). Enjet is clearly entitled to assert its claim for breach of contract.

### 2. *Enforceable contract*

■ Stapp argues that an enforceable contract did not exist between Stapp and Enjet after Enjet filed for bankruptcy. Stapp contends that because the spot contract was entered into prepetition and was executory, it could only be considered a valid contract if it was assumed by Enjet and the assumption was approved by the court.

The debtor argues in response that the spot contract was not executory, but was an enforceable contract that was breached by Stapp. The debtor argues in the alternative that even if the spot contract was executory, the payment of the charter hire on or about January 6, 1995 by Enjet was an assumption of the contract.

■ Section 365(a) of the Bankruptcy Code permits the trustee to assume or reject any executory contract of the debtor subject to court approval. 11 U.S.C. § 365(a). While the Code does not define executory contract, courts applying Section 365(a) have indicated that "an agreement is executory if at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party." *In re Murexco Petroleum, Inc.,* 15 F.3d 60, 62–63 (5th Cir. 1994). The common element of all executory contracts appears to be reciprocal obligations between the parties. *In re Placid Oil Co.,* 72 B.R. 135, 138 (Bankr.N.D.Tex.1987), *citing, NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 522 n. 6, 104 S.Ct. 1188, 1194 n. 6, 79 L.Ed.2d 482 (1984). A contract is not executory as to a party simply because the party is obligated to make payments of money to the other party. *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.,* 756 F.2d 1043, 1046 (4th Cir.1985); *In re Placid Oil,* 72 B.R. at 138.

■ Based on these precepts, the court finds that the spot contract was not executory. Absent in this case are reciprocal obligations between the parties. Stapp and Enjet entered into the spot contract prior to the bankruptcy filing. Enjet loaded its oil onto Stapp's barges for delivery to Galveston prior to the bankruptcy filing. At that point, Stapp was obligated to deliver the fuel to Galveston. Enjet's only remaining obligation was to pay Stapp the agreed upon fee once the oil was delivered. Because the debtor's only duty was to pay money, the spot contract is not executory. Furthermore, even if it were an executory contract, the tender of the check in the amount of $41,872.28 on January 6, 1995 was an assumption of the spot contract and satisfaction of the only performance obligation owed to Stapp by Enjet. Stapp's argument that there was no enforceable contract must fail.

### 3. *Breach of contract*

■ Enjet and Stapp entered into a contract whereby Stapp agreed to transport and deliver two barges loaded with oil to GTI. When the barges arrived at GTI on January 6, 1995, Stapp refused to discharge the Product unless it received payment for the present charter fee as well as all prepetition amounts owed. This refusal was made even though Enjet tendered a check for $41,872.28 for payment of the present charges. Stapp in effect held Enjet's Product hostage to its alleged claim for setoff. Considering the bankruptcy filing, and the automatic stay imposed, this claim was clearly invalid. Stapp breached the spot contract with Enjet when Stapp refused to discharge Enjet's fuel.

### 4. *Damages*

■ Texas law must be applied because both Enjet and Stapp are Texas corporations, and the breach occurred in Texas.

■ Damages for breach of contract are those losses that are the "natural, probable, and foreseeable consequence of the defendant's conduct." *Federal Deposit Insurance Corp. v. Perry Brothers, Inc.,* 854 F.Supp. 1248, 1266 (E.D.Tex.1994). "The universal rule for measuring damages for breach of contract is just compensation for the loss or damages actually sustained." *Colorado Interstate Corp. v. CIT*

*Group/Equipment Financing, Inc.,* 993 F.2d 743, 751 (10th Cir.1993) (applying Texas law).

Because Stapp did not discharge the Product, Enjet was forced to buy additional fuel in St. Rose, and divert the M/V PORT AU PRINCE to pick up the fuel in St. Rose. The diversion charges of $66,747.52 are recoverable.

In addition, Enjet incurred $3,043.00 for inspection charges for loading the M/V PORT AU PRINCE in St. Rose. These charges are recoverable.

Enjet also incurred recoverable charges of $801.50 for inspection of the Product because Stapp broke up delivery of the Product into two shipments.

■ Enjet claims it is entitled to damages of $1,663.29, consisting of interest Enjet paid Bank of America on the amount of $199,703.88 for the period of January 24, 1995 through February 24, 1995 ($199,703.8 × 9.5% × 32 days).

These damages were not sufficiently proved by Enjet. Although the parties stipulated that Enjet paid the Bank of America interest at an annual rate of 9.5% on all borrowed funds beginning on January 24, 1995, no evidence was introduced supporting the claim that Enjet actually incurred such interest rate charges during that period. This amount will not be permitted.

Consequently, Enjet is entitled to damages in the total amount of $70,592.02.

Enjet also claims entitlement to attorney's fees.

■ Under Texas law, "[a] person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for: ... (8) an oral or written contract." *Tex.Civ.Prac. & Rem* § 38.001. To recover attorney's fees under Section 38.001, "the claimant must present the claim to the opposing party or to a duly authorized agent of the opposing party". *Tex.Civ.Prac. & Rem.* § 38.002(2). The award of reasonable attorney's fees to a plaintiff recovering on a valid claim founded on a written or oral contract preceded by proper presentment of the claim

is mandatory. *In re Smith,* 966 F.2d 973, 978 (5th Cir.1992).

Enjet did not present evidence as to its attorney's fees at the trial, and indicated it would file a statement if it prevailed on its claims. Accordingly, the court will enter an order setting forth appropriate deadlines for Enjet to file its evidence of presentment of the claim, and fee statement, and for Stapp to respond thereto.

### 5. *Mitigation of damages*

■ Stapp argues that Enjet is not entitled to recover anything because it failed to mitigate its damages. Stapp first argues that Enjet refused to give Stapp simple assurances on January 12, 1995 that Enjet would not interfere, or cause any interference with, Stapp's barges. Stapp contends that if Enjet would have made such assurances, Enjet could have had substantially all of its fuel on January 12, 1995.

The evidence does not support Stapp's argument. The evidence showed that on January 12, 1995, Stapp made an offer to keep Enjet's check for $41,872.28, return 37,419.05 barrels of fuel, and keep 10,365.19 barrels, *if* Enjet would agree not to interfere with Stapp's barges. This offer can hardly be said to result in the return of "substantially all" of Enjet's fuel. In addition, the evidence showed that all of the fuel was needed to comply with the spot contract. The return of 37,491.05 barrels, while keeping 10,365.19 barrels, would not have permitted Enjet to fulfill the spot contract. Enjet would still have had to buy additional fuel. Finally, there was no evidence that Enjet ever had any intention to interfere with Stapp's barges, let alone that any interference actually took place. This "offer" was hardly a reasonable one because Stapp retained possession of a large quantity of Enjet's oil.

■ Stapp further argues that Enjet failed to mitigate its damages because it refused Stapp's alternative offer to return the 37,419.05 barrels, and to sell to Enjet, at market value, the remaining $166,979.75 worth of fuel that Stapp was holding.

This argument is absurd. Enjet can hardly be expected to mitigate its damages by paying Stapp for fuel Enjet already owned.

Stapp's offer to sell Enjet its own oil in return for the amount of the prepetition invoice amount owed was a coercive collection tactic that will not be tolerated.

Stapp's claim that Enjet failed to mitigate its damages fails.

### D. *Conversion Claim*

Having found that Stapp is liable to Enjet on the breach of contract claim, the court need not consider the debtor's alternative claim for damages resulting from Stapp's alleged conversion of the Product.

### III. *CONCLUSION*

For the foregoing reasons, the court finds in favor of Enjet and against Stapp on Enjet's claim for breach of contract. Damages are awarded in favor of Enjet in the amount of $70,592.02. As to attorney's fees, Enjet is to file evidence of presentment of the claim, a verified schedule of attorney's fees, and a supporting memoranda indicating why its evidence constitutes presentment of the claim in compliance with Texas law by March 17, 1997. Stapp's opposition is due by March 28, 1997. Enjet may file a reply, if it chooses to do so, by April 4, 1997. The court will rule on the question of attorney's fees on the memoranda, unless on or before April 4, 1997, either party requests oral argument.

An order will be entered in accordance with this memorandum opinion. A judgment will be rendered after the determination of the amount of attorney's fees, if any, to be awarded.